T. Simon v. The State.

*No. 43. Decided October 26.*

**1. Incest — Evidence — Declarations of Parents Inadmissible as to Illegitimacy of their Offspring Born in Wedlock.**—On a trial for incest, where defendant was being prosecuted for marriage with the daughter of his half-sister by the same father, defendant proposed to prove the declarations of his deceased mother and his deceased father, that he (defendant) was not the son of his supposed father; that there was no blood relationship existing between himself and his supposed half-sister; and the further declaration of his deceased mother, that " if defendant got into trouble by his marriage, she would protect him," *held*, that the evidence was inadmissible, there being no evidence of nonaccess between the supposed parents, nor that they were not living together, nor of impotency on the part of the putative father when defendant was conceived in his mother's womb.

**2. Same.**—It is a well established rule, and supported on the highest considerations of public policy, that the lips of parents are sealed as to any testimony which would assail the legitimacy of their children born in wedlock.

**3. Same.**—Declarations of defendant's deceased mother, that he was illegitimate, though born in wedlock, made to him about the time of his marriage, were inadmissible to prove good faith on his part in entering into the marriage. The general rule as to admissibility of declarations of deceased persons as to relationship, birth and marriage, and establishing pedigree, is not applicable, because if the mother were living she could not testify as a witness to the facts proposed.

**4. Same—Charge of Court—Proof and Legality of Former Marriage.**—Defendant's mother, at the time of her marriage with his father, was a widow M., who had a son who bore the name of M., and claimed M. as his father. On the trial of the accused for incest with his half-sister's daughter, where the defense was that he was not the son of his putative father, it was *held*, that an objection that the court declined and refused to charge the jury that in order to make valid his mother's second marriage, it must have been established that her former husband was dead, or that she had been divorced from him, was without any force, there being no evidence that she had ever, in fact, been married to M. except that she had a son bearing M.'s surname, and who claimed that M. was his father. It has never been held that a name and child were proof of marriage.

**5. Illegality of Marriage no Defense to Incest.**—The justice of the peace who solemnized the rites of matrimony, was a citizen and justice of another county. On this account defendant claimed that the marriage was illegal. *Held*, that the crime of incest, though defined under article 329, Penal Code, to be intermarriage with or carnal knowledge of persons within the forbidden degrees, does not require proof of marriage to sustain it. Cohabitation or carnal knowledge, if proved, are sufficient to establish incest, without proof of marriage.

**6. Marriage — Proof and Validity of, in Criminal Law.**—All that can be required in any case involving marriage, is proof of a valid marriage, for a violation of which the parties thereto may be punished. Whatever be the form of the ceremony, or if there be no ceremony, if the parties agree presently to take each other for husband and wife, and from that time on live professedly in that relation, proof of these facts would be sufficient to constitute proof of a

marriage binding on the parties which would subject them to legal penalties for a disregard of its obligations.

7. **Fact Case.**—See case stated in the opinion where the facts establishd a valid marriage in contemplation of criminal law.

ON MOTION FOR REHEARING.

8. **Indictment, Sufficiency of**—**Incest.**—Where it was objected to the sufficiency of an indictment for incest, that it was "fatally defective in alleging that defendant did *unlawfully* intermarry with C. Budde, because it thereby failed to charge affirmatively that there was a marriage," *held*, the indictment is correct; it charged a *marriage*, and that it was an *unlawful* one.

9. **Indictment—Incest—Knowingly.**—An indictment for incest is not defective because it failed to charge that defendant knowingly entered into an unlawful marriage. The statute, article 329, Penal Code, does not employ the word "knowingly" in defining "incest."

10. **Charge of the Court—Weight of Evidence.**—On a trial for incest, where the indictment charged that the criminal act was committed with one C. Budde, the daughter of one T. Budde, the half-sister of defendant, and where there was no question in the evidence but that C. Budde was the only daughter of T. Budde, as alleged, and that T. Budde was the only half-sister of defendant, *held*, that a charge which instructed the jury that if they believed that C. Budde is a daughter of a half-sister of defendant they should find defendant guilty, is neither a charge upon the weight of evidence, nor does it illegally assume that the mother of C. Budde was a half-sister of defendant.

11. **Illegal and Inadmissible Evidence.**—A party can not be heard to complain of illegal and inadmissible testimony, where he neither excepted to it at the time of its introduction, nor made a motion to strike it out after it was introduced.

12. **Evidence.**—See evidence which was held inadmissible, incompetent, and properly excluded by the court, with regard to the illegitimacy of the defendant, and the supposed legality of his marriage with his niece.

Appeal from the District Court of Goliad. Tried below before Hon. H. Clay Pleasants.

This appeal is from a judgment in the court below for incest. The incestuous intercourse, as alleged in the indictment, consisted in the fact that the defendant had married the daughter of his half-sister.

Louis Sitterlee, for the State, being sworn, testified substantially: That in September, 1888, he and his wife went with one Hall, who was a justice of the peace of Victoria County, to the house of Louis Budde, in Goliad County, to attend the wedding of defendant. That the marriage license was issued by the clerk of the County Court of Victoria County. That Hall, the justice of the peace, performed the marriage ceremony between the defendant T. Simon and C. Budde in Goliad County. That witness and his wife and one or two others were present and witnessed the marriage. That before the marriage the question was raised, whether the defendant and C. Budde were so related as to be prohibited by law from intermarrying. That after some conversation and discussion of the

matter between the justice of the peace and Louis Budde and wife, Hall, the justice, finally decided that the parties could lawfully marry, and he performed the ceremony. Here the marriage license and the return thereon of Hall, the justice of the peace, were shown to and identified by the witness.

Louis Budde testified: That he was the father of C. Budde, who was married to the defendant in September, 1888, as described by the witness Louis Sitterlee. That his wife's name was Theresa. That he knew from general reputation that said Theresa was the daughter of Mathias Simon by a former marriage. That he knew Mathias Simon in his lifetime, and that said Simon was reputed to have been married a second time, in Calhoun County, to one Mrs. Caroline Malitz, in 1857. That Mathias Simon's first wife was the mother of Theresa, witness' wife, and she was dead at the time of the second marriage of Mathias Simon and Mrs. Caroline Malitz. That witness was not present at this second marriage, and only knows that the parties were married from the fact that they lived together as husband and wife. That he had heard that defendant, Theodore Simon, and Henry Simon were the children of Mathias Simon and Caroline Simon, formery Malitz, but he did not know this of his own knowledge. That one Gus Simon, half-brother of defendant and Henry Simon, was said to be the son of Charles Malitz and Caroline Simon, formerly Malitz. That Mathias Simon died in 1867, and that the defendant had lived for some years with witness and his family. That he knew nothing of defendant's relations with his, witness', daughter except what he had heard.

Gus Simon testified: That he was a half-brother of defendant, and that his mother and defendant's mother was formerly named Mrs. Caroline Malitz. That his father's name was Charles Malitz. That his father did not treat him right or provide for him, and that when his mother afterwards married Mathias Simon, he went with his mother to his stepfather's, assumed his name, and lived with him. That he, witness, was born in 1855. That defendant was upwards of 30 years old, and that he, witness, had always understood that defendant was the son of Mathias Simon, and that his mother had told him, after defendant had married, that she could clear him if he got into trouble. Defendant was younger than witness, and was his half-brother.

Dr. Reuss testified: That he was well acquainted with Mathias Simon and his first wife, and that Theresa Budde, the mother of C. Budde, was the daughter of said Mathias Simon and his said wife. That after his first wife died, Mathias Simon married Mrs. Malitz. That witness did not know, of his own knowledge, of the marriage, but they lived together as man and wife. He also knew the defendant and his half-brother, Gus Simon. That defendant was reputed to be the child of Mathias Simon and his second wife, who were reputed to have married in 1857, and that Mathias Simon died in 1867.

Theresa Budde, sworn, testified: That she was the wife of Louis Budde, and the mother of Carrie Budde, who married the defendant. And she also testified to the marriage by the justice of the peace, as was already testified to by the witness Sitterlee. That she was a daughter of Mathias Simon by a former marriage. That she never told Louis Sitterlee that she was a half-sister of defendant. That she thought, at the time of defendant's marriage with her daughter, that defendant and her daughter were not related. That defendant and her daughter were married in Goliad County in September, 1888. That her daughter was delivered of a child sometime in March, 1889. That the child was defendant's. That defendant stopped living with her daughter as soon as he was indicted by the grand jury. Before the indictment they lived together as man and wife. That the defendant sold his property, and her daughter came back to live with her after the indictment was found.

Mrs. —— Simon, sworn, stated: That she was the wife of the brother of Mathias Simon, whom she knew, and who died in 1867. That it was generally reported that he had married a second time, one Mrs. Malitz, and that they had two children—defendant and Henry Simon. That she had only seen the defendant a few times, and did not know much about him.

Louis Sitterlee, recalled, stated: That on the night of defendant's marriage to C. Budde, he asked Mrs. Budde, the mother of Carrie, and that she told him that Carrie was defendant's half-niece, and that about a half-hour before the marriage he told the defendant of the relationship, and that they ought not to be married.

This is all the testimony in the case.

Defendant's counsel requested the court to charge the jury:

First. That if they believed from the evidence that a justice of the peace of Victoria County, Texas, attempted or undertook to perform and did perform the act of alleged marriage between defendant and Carrie Budde, in Goliad County, State of Texas, then the alleged marriage is not performed according to law, and no legal marriage has been proven between defendant and said Carrie Budde, by reason of said act of said justice, and the jury will acquit the defendant.

Second. That if the jury believe from the evidence that the second wife of Mathias Simon, a Mrs. Malitz, was at one time the wife of Charles Malitz, then it must appear, by legal evidence, that the said Charles Malitz was either dead or divorced from his said wife, before the jury will be authorized to find that there was a legal marriage between the said Mathias Simon and the said Mrs. Malitz; and unless there was such legal marriage the jury will acquit the defendant.

Third. If the jury believe from the evidence that defendant is not the son of Mathias Simon, or have a reasonable doubt that he is such, they will acquit the defendant.

Fourth. Before the jury will be authorized to convict the defendant, they must find that defendant and said Carrie Budde were married by one of the persons authorized by law to perform rites of matrimony, otherwise they must acquit the defendant; and if said marriage was performed by a justice of the peace, then it must appear that said justice of the peace resided, at the time of said alleged marriage, in Goliad County, State of Texas, otherwise the jury must acquit the defendant.

Fifth. In order to make the defendant guilty of the offense charged, he must have known, at the time of his alleged marriage to Carrie Budde, his relationship to her to have been within the prohibited degree, otherwise the jury must acquit.

These special instructions were refused by the court, and bills of exception duly reserved by defendant's counsel.

The court, in the charge which was submitted to the jury, after stating the case, and defining incest, instructed them as follows, in the third paragraph of the charge, to-wit: "If under the law, as given in the previous paragraphs of this charge, the jury find from the evidence that the defendant did, as charged, marry and cohabit with one C. Budde, and that she, the said C. Budde, is the daughter of a half-sister of the defendant, the jury should find the defendant guilty as charged, and assess his punishment," etc.

This paragraph of the court's charge was specially excepted to, because it was claimed that it was upon the weight of evidence.

Defendant's first bill of exceptions was reserved to the testimony of Louis Sitterlee, because his evidence showed that the purported marriage, testified about by him, was illegal—because it was solemnized in Goliad County by a justice of the peace for Victoria County, Texas.

Defendant's second bill of exceptions was reserved to the ruling of the court in allowing the State to introduce the marriage license as evidence, over defendant's objections, because the same was illegally executed by a justice of the peace of Victoria County, in the county of Goliad.

Defendant's third bill of exceptions was reserved to the action of the court in refusing to permit his, defendant's, witness, Henry J. Simon, to testify as to declarations and statements made to the witness by Caroline Simon, the mother of defendant, before the alleged marriage of the defendant to C. Budde, to the effect, that defendant was not related to C. Budde, and that if defendant should ever get into trouble, she could clear him; which testimony the court excluded, because the chastity of defendant's mother could not be attacked in such manner, and was hearsay, and inadmissible. The court further ruled out the testimony of Louis Budde to the same effect, and for the same reason.

Defendant's fourth bill of exceptions was reserved to the action of the court in excluding the testimony of Theresa Budde, mother of Carrie Budde, to the effect, that her father, Mathias Simon, and Caroline Simon,

the mother of defendant, had both told her that the defendant was not the son of said Mathias Simon; which testimony was excluded by the court upon the ground that it was an attack upon the chastity of the mother of defendant; that defendant was presumed to be the son of Mathias Simon, he having been born in wedlock and during the time his parents were living together, and that such fact ought not, and could not, be proved, if a fact, by the mother herself, were she alive and testifying as a witness in the case.

*Crain, Kleberg & Grimes,* for appellant.—The appellant was indicted, tried, and convicted in Goliad County, Texas, for incest, and his punishment assessed at three years in the penitentiary, from which judgment he prosecutes this appeal.

The errors upon which he relies and insists for a reversal of the said judgment are clearly and separately stated in the assignment of errors, and such as are most important will be especially urged in this brief and called to the attention of the court.

One of the errors assigned is, that the court erred in excluding the testimony of Louis Budde, Theresa Budde, and Henry J. Simon, as to the declarations of Mrs. Caroline Simon, the deceased mother of the defendant, and Mathias Simon, the alleged father, to the effect that the defendant and Carrie Budde, his alleged wife, were not related; that she, Caroline Simon, could clear defendant if he should get in trouble, and that defendant was not the son of Mathias Simon.

The court evidently based its ruling upon the general principle in bastardy proceedings, that parents are not permitted to bastardize their children born in legal wedlock by proof of nonaccess; that when parties are lawfully married neither of them can be allowed to testify that the offspring of the mother is spurious. Goodright v. Moss, 2 Cowp., 592; 1 Greenl. Ev., secs. 253, 344. This is the principle laid down in civil cases and bastardy proceedings, that while the mother can testify to acts of incontinency and adultery (1 Greenl. Ev., sec. 150; 2 Stark. Ev., 554, 845; 2 Am. and Eng. Encyc. of Law, 149, Bastardy), yet her declarations as to the illegitimacy of her children are not evidence, for reasons of public policy. 2 Stark. Ev., 200; Goodright v. Moss, supra; 1 Greenl. Ev., sec. 253. Although this rule has been relaxed in modern times, and in Kentucky, we believe, it was held by the Supreme Court, in Goss v. Froman, 12 Southwestern Reporter, 387, that evidence is admissible of the conduct and statements of the husband and wife, while living together apparently in that relation, tending to show nonaccess, as the presumption of access from opportunity is not conclusive.

But the principle that the statements of the parents can not be introduced to bastardize their children born in legal wedlock, and all the cases cited in support of that doctrine relate to the rights of the child and are

based upon the policy that the parents owe protection, maintenance, and education to their offspring, and inasmuch as that nonaccess can generally be proved by separation, physical impotency, etc., that public policy and decency forbid a parent to prove nonaccess by the simple declarations of the parent, in order to bastardize their offspring, and thus to deprive it of both a name and an estate. But where the liberty of such child is in question, does not the reason of the rule cease, and should it not be permitted, under the rule of evidence which permits pedigree to be proved by hearsay, to prove by the declarations of its mother and its alleged father, that it is in truth and in fact not the child of its alleged father?

The charge of incest against defendant rests upon the fact of blood relation, to-wit, uncle and niece; if, therefore, it can be shown that he was not the son of Mathias Simon, he could not possibly be related in any remote degree to Carrie Budde, who is the child of Theresa Budde, a daughter of Mathias Simon by a former wife.

The statute, article 332, Penal Code, especially provides, that the fact of relationship between the parties may be proved in the manner in which that fact is established in civil suits—that is, hearsay is competent evidence to prove pedigree, relationship, etc. Rule 35, art. 2245, Sayles' Civ. Stats., note 171. What better evidence, then, of relationship than the statements of the deceased mother; what better evidence of the paternity of the defendant than the statements of his mother, corroborated by the statements of the person who is alleged to be his father?

The rule applicable to bastardy proceedings exists principally for the protection of the child, that he shall not be disinherited; thus it serves as a shield to the child; but can it be invoked by the State, in a prosecution for incest, to turn it upon the child as a sword? Or should not the child, who has the double misfortune of being a bastard and of being accused of a crime, have the right to vindicate itself by being permitted to prove, under the rules of evidence permitting hearsay to establish relationship, that in truth and in fact there exists no such relationship?

But the court in rejecting this evidence assumed that a legal marriage had been proven between Mathias Simon and Mrs. Caroline Malitz, and thus withdrew this issue from the jury; otherwise it should have admitted this testimony, under proper charge of its view of the law, to-wit, that if the jury believed from the evidence that a legal marriage between said Mathias Simon and Caroline Malitz had been proven, then they must assume that the defendant, if born during the existence of such legal marriage, was the son of Mathias Simon; but if, on the other hand, the jury should find from the evidence that said Mathias Simon and Caroline Malitz were not legally married, or that there was a reasonable doubt in their minds as to the legality of such marriage at the time of the birth of defendant, they could consider the evidence as to the fact whether he was in fact the son of said Mathias Simon. Certainly the defendant

should have been permitted to introduce said testimony under this phase of the case; because if said Mathias Simon and Caroline Malitz were never legally married, or if a reasonable doubt existed as to the legality of such marriage, then certainly the legal presumption that children born in legal wedlock are presumed to be the children of their said alleged parents ceases and is swept away by that other presumption of nullius filius, and the relationship must be established by other evidence. It becomes a question of fact. Blackburn v. Crawfords, 3 Wall., 175; 12 How., 534.

This latter view is strengthened under another position, to-wit, that the court erred in not giving defendant's special charge, wherein the jury are instructed that if they find from the evidence that Caroline Malitz and Charles Malitz were married, then it must appear that they were divorced or said Charles Malitz was dead at the time of the alleged marriage between Mathias Simon and said Caroline Malitz; because if this issue had been submitted and the jury had found that a marriage existed between Charles and Caroline Malitz, and had not been dissolved by death or divorce, then certainly the alleged marriage between Mathias Simon and Caroline Malitz was invalid, and the said testimony as to the declarations of said Mathias Simon and Caroline Simon, or Malitz, would have been relevant, and should have gone to the jury; and the issue whether defendant was the son of Mathias Simon was one of fact, and should have been submitted in defendant's special charge on this point.

Again, this evidence was important upon the question of intent. If the defendant had notice through his mother and so-called relations that he was not in fact related to Carrie Budde, or was honestly of that opinion, although in fact he was related, then he could not be guilty, as he could not be punished for a mistake in fact.

The appellant further insists that the court should have given appellant's said special charge as to whether there existed a marriage between Charles Malitz and Caroline Malitz, and whether it had been dissolved by death or divorce, independently of the phase first discussed. The question of marriage between the said Charles and Caroline sufficiently arose to require such a charge. Both had the same name; they had a child together, which must be presumed that it was born in wedlock. Said child testifies himself that he was not well treated by his father, etc., and that he then went to reside with his mother and assumed the name of Simon. The said Caroline Simon is referred to by several witnesses as being formerly Mrs. Caroline Malitz. We insist that this evidence raised the issue of a marriage between Charles Malitz and Caroline Malitz, and the rule laid down in the case of McGrew v. The State, 13 Texas Court of Appeals, 340, applies. At any rate the issue as to whether there was a marriage between Charles Malitz and Caroline Malitz was one of fact, and should have been submitted to the jury.

The court erred further in not submitting defendant's special charge on the question as to whether defendant knew at the time of the alleged marriage that he was related in the prohibited degree to the said Carrie Budde. The question of intent naturally arises from the evidence, that the justice of the peace and the family discussed defendant's relationship, and after said consultation the justice remarked that defendant and Carrie Budde were not related in the prohibited degree. This was the opinion of Theresa Budde, the mother of Carrie Budde, all of which expressions were in the presence of defendant. Louis Sitterlee testifies that Mrs. Budde told him that defendant was a half-brother to her, and that he told defendant. Mrs. Budde denies this—all of which raised the issue as to intent, and whether defendant knew at the time that he was related to Carrie Budde.

The court erred in not defining a legal marriage, and the general charge of the court was excepted to upon this ground, and a special charge tendered. The court simply charged, in effect, that if the jury believed from the evidence that defendant intermarried with Carrie Budde, and that the said Carrie Budde was the daughter of defendant's half-sister, to find the defendant guilty. The court in felony cases being required to charge the law, and the principal issue turning upon the question of marriage, it seems to us that such a charge was indispensable, especially after the court's attention was directed to this issue by special charge and exceptions to the general charge. As well charge a jury in a theft case, that if they believed from the evidence that defendant stole the alleged property, to convict him, without defining what theft is. Here defendant is charged with an unlawful marriage, and the court omits to charge what constitutes a valid marriage. Our courts have held that a valid legal marriage is one which has been solemnized according to the mode and manner and in accordance with the prerequisites which the law of the place where solemnized has required; and that the laws of this State prescribe that a license shall be granted, and that the rites be performed by some one of the officials named in the statute as being authorized to perform them. These are the legal requisites to a valid marriage in this State, and any other form not in conformity with these requirements of law would be illegal and void in prosecutions for illegal marriage. Dumas v. The State, 14 Texas Ct. App., 473. How was it possible under the charge of the court for the jury to decide whether a legal and valid marriage had taken place between Mathias Simon and Mrs. Caroline Malitz, or between the defendant and Carrie Budde? And yet the whole case turned upon these marriages, and especially the marriage of defendant and Carrie Budde. Under the charge of the court the jury were left to expound the law applicable to the facts as to the fact whether a valid marriage had been proven or not—the court's charge did not inform them.

This brings us to the main issue in the case; that is, whether in fact a valid marriage ever took place between defendant and Carrie Budde. Exceptions to evidence and special charges were made in time to bring this question squarely before this court. That is, whether a justice of the peace residing in Victoria County can solemnize the rites of matrimony in Goliad County. If, as decided in the case just cited, certain officials named in the statute are the only persons authorized under our law to solemnize the rites of matrimony, then it follows that they can only do so in the territory of their respective jurisdictions; otherwise it would not have been necessary that the law designated any particular officials or persons, and any credible person might have done so. But the statute (Revised Statutes, article 2838) evidently contemplates, when among other officials it designates all justices of the peace "of the several counties" as authorized to celebrate the rites of matrimony, that said justices of the peace shall exercise this extraordinary function within their precincts, or at least within their respective counties. Each justice of the peace is commissioned as such for his precinct, and ex officio notary public of his county (Revised Statutes, article 1535), and he can not exercise his official functions within the limits of another precinct, except as notary, and if he attempts to do so his act would be void. Foster v. McAdams, 9 Texas, 542; Clements v. City of San Antonio, 34 Texas, 26. What reason is there, then, that in a criminal case, as the one at bar, a justice of the peace should possess these extraordinary powers? Were this a civil suit in which the rights of heirs to an estate were involved, it could—unless marriage was based upon the further facts that the parties had recognized the marriage, lived together for a long time as husband and wife, and such a construction became necessary to protect the heirs, in which case the marriage might be recognized, though it would be doubtful—not be claimed that there was a valid marriage under the laws of Texas. Much stronger then is the reasoning against the validity of this marriage, when it is the very issue in a criminal case which involves the liberty of the defendant. In construing the legislative intent of this statute we must presume that it imposes a limitation of the exercise of these important functions by the justice of the peace to the territory of his precinct, or at least to his county. Otherwise a justice of the peace residing in Starr County, on the Rio Grande, could celebrate the rites of matrimony in Cooke County, on the Red River. Certainly this would open the doors wide to fraud and imposition, and we would have the extraordinary spectacle of roaming and itinerant justices of the peace traveling over the State with their commissions in their saddlebags, marrying people indiscriminately, like the hedge priests of old.

In conclusion, we would call the court's attention to the charge of the court below. Appellant urges two exceptions to the language of this charge. The first is that portion which instructs the jury that they are

judges of the weight of the evidence, etc.   We respectfully submit that this is not the law, as they should have been instructed that they were the exclusive judges of the facts proved and of the weight to be given to the testimony.   Code Crim. Proc., art. 728.   The other objection is, that the last paragraph of the court's charge is on the weight of the evidence.   The court instructed the jury that they could consider any circumstances of aggravation and mitigation, if any were proved, etc. This charge must have operated to the prejudice of the defendant, from the fact that the evidence disclosed that there was a premature birth of a child, and the jury, no doubt, were influenced by the court's charge, and found this to be a circumstance of aggravation, and thus added one year to the lowest penalty which the law imposes.   Exceptions to the court's charge were saved at the time, and we insist that it is clearly obnoxious to the objections urged, and, no doubt, operated to the injury of the defendant.

Wherefore appellant respectfully submits that for the errors assigned the judgment of the court below should be reversed and the cause remanded.

ON MOTION FOR REHEARING.

*Crain, Kleberg & Grimes*, and *Baker & Summers*, for appellant.—The judgment of affirmance should be set aside, for the reasons set out in the assignment of errors, and for the further reason that there are errors apparent of the record of the cause, heretofore not presented to your honorable court, which are fundamental, and which demand the reversal of the cause.   First.   The indictment is fatally defective for two reasons:

1.  The said indictment fails to affirmatively charge a marriage between defendant and the daughter of his half-sister, but, on the contrary, affirmatively denies a marriage, because it says that defendant did unlawfully intermarry—the word unlawfully being necessarily an allegation of the manner of his said marriage.

2.  The indictment fails to allege that defendant, at the time of his marriage with C. Budde, the daughter of T. Budde, knew that C. Budde was the daughter of his half-sister.   The incest attempted to be alleged being a marriage, and not cohabitation or carnal intercourse, it must be alleged that the marriage was illegal, and that defendant knew he was marrying the daughter of his half-sister.   On this last proposition we beg to refer the court to the following authorities:   Baumer v. The State, 49 Ind., 544; The State v. Bullinger, 54 Mo., 142; Williams v. The State, 2 Ind., 439; 10 Am. and Eng. Encyc. of Law, ch. Incest, 343.

Defendant assigns as further reason for the reversal of this cause, that the charge of the court failed entirely to present to the jury the case which is alleged in the indictment against him.   Nowhere in said charge

is the incest alleged in the indictment presented to the jury with appropriate and necessary instructions, because the indictment charges that T. Simon did unlawfully intermarry with C. Budde, the daughter of T. Budde, the half-sister of defendant T. Simon.

The charge instructs the jury as follows: "If under the law, as given in the previous paragraphs of this charge, the jury find from the evidence that the defendant did, as charged, marry and cohabit with one C. Budde, and that the said C. Budde is the daughter of a half-sister of the defendant, the jury should find the defendant guilty." By this charge the jury were told to convict defendant if they found from the evidence that defendant married the daughter of any half-sister to him. The indictment specifically states whose daughter C. Budde was; that she was the daughter of T. Budde, and that T. Budde is the half-sister of defendant; therefore the charge should have been confined to the allegation of the indictment; and as it was not, and no other paragraph of the charge did present the case as alleged, the charge is fatally and fundamentally defective and the judgment should be set aside. Powell v. The State, 12 Texas Ct. App., 238; Jones v. The State, 22 Texas Ct. App., 680; Tooney v. The State, 5 Texas Ct. App., 163; Coleman v. The State, 21 Texas Ct. App., 520; Willis v. The State, 24 Texas Ct. App., 487, and cases cited.

This charge was excepted to as being on the weight of evidence. It clearly, positively, and distinctly assumes that C. Budde was the daughter of T. Budde, or it fails to present the case preferred in the indictment.

It is further on the weight of evidence, in directing the jury to consider circumstances of aggravation and mitigation if any are disclosed, because in assuming first that C. Budde was the daughter of T. Budde, the jury would necessarily conclude on the instruction as to the measure of punishment that in the opinion of the court the defendant was guilty.

By the record is disclosed, that one Louis Sitterlee testified, that on the night of defendant's marriage, he (witness) being present, talked with the mother of C. Budde as to the relationship existing between defendant and said C. Budde; that he was informed by her that defendant and C. Budde were related; that C. Budde was defendant's half-niece; that he (witness) then, before the marriage ceremony had been performed, went to defendant and told him that C. Budde was his half-niece, and that he ought not to marry her.

The admission of this testimony was a most prejudicial act to the defendant. He sought to rebut it by showing by Henry Simon and others that his (defendant's) mother had repeatedly declared that he (defendant) was in no way related to C. Budde, and had assured defendant that she could and would clear him of any charge that might be preferred against him for a wrongful marriage. The court refused to allow defendant to rebut with this testimony, fact by fact, hearsay by hearsay, although the question involved was as to defendant's knowledge of the

relationship. Clearly, then, if it be against public policy to allow the mother to impeach her own chastity, yet it is nevertheless just that the defendant should not have evidence introduced as to information to a different purport, communicated to him by another who was in no position to know.

This evidence of Louis Sitterlee undoubtedly influenced and inflamed the jury; the court directed, virtually, their attention to it; and because it is illegal, and under the law no evidence whatever, it does seem that its admission is such error as to demand a reversal of the cause. 22 Texas Ct. App., 372; 23 Texas Ct. App., 336; 23 Texas Ct. App., 568.

*R. L. Henry*, Assistant Attorney-General, for the State. — Appellant contends that a rehearing should be granted because the indictment is fatally defective, in that it does not allege that appellant knowingly entered into marriage with C. Budde. The statute, article 329, Penal Code, does not employ the word knowingly in describing the crime of incest, but says all persons who are prohibited to marry by the succeeding articles, who shall marry or carnally know each other, shall be punished, etc. One of the cases cited by appellant construes a statute similar to this, and holds to the contrary of appellant's contention. This case holds, that " when such express statutory language does not exist, and the matter rests merely upon the ordinary rule of pleading, there is no necessity for the indictment to allege a knowledge of the relationship on the part of the defendant." The State v. Bullinger, 54 Mo., 143. In this case the Supreme Court of Missouri held, that it was not necessary that an indictment should charge that defendant had knowledge that the person with whom he intermarried was in any way related to him. The statute, as it then existed in Missouri, did not use the word " knowing " or " knowingly."

In the case of Baumer v. The State, 49 Indiana, the Supreme Court held, that it was necessary for the accused to have knowledge of his relationship with the person with whom he had intercourse, for the reason that the statute employed the word " knowing," which was unlike our statute, in that it required knowledge of the relationship. The case of Williams v. The State, 2 Indiana, 439, construed the same statute, which was substantially, " that if any father shall have intercourse with his daughter, knowing her to be such, he shall be deemed guilty of incest,". etc. Here the Supreme Court held, it was necessary to charge in the indictment a knowledge of the relationship, because knowledge was required by the statute. See also Barker v. The State, 30 Ala., 531; Bergen v. The State, 17 Ill., 426; Hicks v. People, 10 Mich., 395.

Appellant also complains of the charge of the court in that it assumed that C. Budde was a daughter of T. Budde, and was on the weight of the evidence. The court simply charged, that " if C. Budde is a daugh-

ter of a half-sister," etc., which was the case in hand. Appellant contends, that the jury were authorized to find that if C. Budde was a daughter of any other half-sister they could find him guilty. The charge is not susceptible of this construction, because there is no evidence to this effect, and the jury could not have been misled by the language of the charge governing them in the cause on trial. The cases cited by appellant do not support this contention, for the reason that they simply go to the effect that it is error for the court to charge on a phase of the case not made by the evidence, which may be considered. All of the cases cited are to this effect. The charge is clearly not on the weight of the evidence, if it did not assume that C. Budde was a daughter of a half-sister, and it certainly did not assume this, for the reason that it says that if C. Budde is a daughter of a half-sister, thereby leaving the matter to be determined by the jury. And the half-sister mentioned was the one about which all the testimony was adduced, and no other, and the jury thought of no other.

SIMKINS, JUDGE.—Appellant was convicted in the District Court of Goliad County of incest, his punishment being assessed at three years in the penitentiary, from which he appeals. There are two grounds of error submitted for reversal which demand consideration.

1. The error of the court in excluding the testimony of Louis and Theresa Budde and Henry Simon as to the declarations of Caroline Simon, the deceased mother of defendant, and Mathias Simon, his putative father, to the effect that defendant was not the son of Mathias, her husband, and that if defendant got into trouble by his marriage she would protect him. The evidence shows that Mathias Simon was twice married; that Theresa Budde was the offspring of his first marriage; that witness Henry and the defendant, Theodore, were the result of the second marriage, which was with Caroline Malitz; that on the 30th day of September, 1888, defendant married Carrie, the daughter of his half-sister, Theresa Budde. The object of the testimony was, first, to show there was no blood relation between defendant and Carrie Budde; and, second, to show that defendant in marrying acted in good faith, honestly believing that no relationship existed between Carrie Budde and himself, and therefore he could not be amenable to law, even though the relationship in fact existed. We are of opinion that the court did not err in rejecting this testimony. It is the rule established in England and America, and supported on the highest considerations of public policy, that the lips of parents are sealed as to any testimony which would assail the legitimacy of their children born in wedlock (Wharton's Criminal Evidence, 518), and relationship is to be proven as in civil cases. Penal Code, art. 332; 2 Am. and Eng. Encyc. of Law, 140.

It is not pretended, nor is there any offer on the part of appellant, as

a predicate for such testimony, to show that there was nonaccess; or that the said Mathias and Caroline were not living together; or that the said Mathias had become impotent when defendant was conceived in his mother's womb. Bish. Marr. and Div., secs. 1168–1171. There is certainly no question as to the legitimacy of Henry Simon, the younger brother of defendant. Had Mrs. Simon been living her testimony would not have been admissible, especially since Mathias was dead, the putative father of defendant. Id., sec. 1179. The rule invoked by counsel on the admissibility of declarations of deceased persons as to relationship and birth, death, and marriage, establishing pedigree, can have no application, for, if she could not testify living, her declarations would not be admissible after her death. 1 Greenl. Ev., 104.

2. Nor do we think the court erred in refusing to admit the declarations of Caroline Simon to sustain appellant's plea of marriage in good faith. As it appears of record, sometime in 1857 Mathias Simon, a widower with one child (Theresa), intermarried with Caroline Malitz, also with one child (Gus), and they lived together as husband and wife until 1867, when Mathias died, leaving Caroline with two children, Henry and Theodore, as the fruit of their marriage. It was understood by all the family and neighbors that defendant was the son of Mathias and Caroline Simon; he was always recognized as such, and no question was raised as to defendant's legitimacy until at or about the time of his marriage to Carrie Budde, his half-niece. Now, the only evidence on which it is sought to hinge good faith is the purported declarations of the mother, that if defendant got into trouble about it, she would protect him; that he was not the son of his putative father, Mathias. How Mrs. Simon proposed to prove this fact seems to have been locked in her own bosom and to have died with her. No witness who knew her in years past points out a single suspicious fact or rumor. Defendant himself shows not the slightest interest in learning who was his real father; he was satisfied with her promise to protect him. This refreshing confidence of a man 30 years of age in the protecting power of the mother to shield him from the law would unquestionably invoke one's sympathy, were it not that he entered into this marriage with the knowledge that the only way his mother could protect him was by bastardizing him and dishonoring herself. For thirty years she had lived as an honest woman and a true wife; yet the defendant does not seem to have hesitated in demanding the sacrifice. Such is the testimony her own children seek to introduce against Mrs. Caroline Simon, deceased.

We can not hold such evidence admissible as a basis for good faith on the part of defendant. If such declarations were ever made by the dead mother, they are not shown to have been made sufficiently ante litem motam. The illegitimacy of defendant seems to have been utterly unknown to the family and to defendant himself until about the time of

defendant's marriage, and then she said she would protect defendant if he got into trouble. It is true Mrs. Theresa Budde offered to testify that her father and Caroline Simon told her that defendant was illegitimate. The time of these declarations is not stated. If Mathias Simon told her, it must have been before his death in 1867; yet, so far as appears of record, she never communicated this important fact either to her husband or defendant, and therefore it could not have been ground for good faith and honest belief by the defendant. On the contrary, as testified to by the witness Sitterlee, Mrs. Budde stated on the very night of the marriage that her daughter was defendant's half-niece.

Neither is there any force in the objection that the court failed to charge the jury that it must be shown to them that Charles Malitz was dead or divorced before they could find the marriage of Mathias Simon and Caroline Malitz was legal and valid. There was no evidence of any marriage between Charles Malitz and Caroline Malitz, save the fact that Mrs. Malitz was so named, and her son (Gus) claimed Malitz as his father. It has never been held that a name and child were proof of marriage. Bish. Mar. and Div., sec. 1029.

The most interesting question arises out of defendant's marriage. The State, on trial of the case, proved that a license was duly issued September 28, 1888, by the county clerk of Victoria County, authorizing the marriage of Theodore Simon and Carrie Budde; that the marriage was performed by S. D. Hall, a justice of the peace of Victoria County, who duly returned said license September 30, 1888, "executed by joining in marriage the within named parties;" but the State further proved that the justice of the peace crossed over into Goliad County and performed the ceremony. It is insisted that there was no marriage, because the justice of the peace can not marry parties outside of his county; that when he went outside of his county he became but a private person, not qualified to discharge any official act; that the indictment simply alleges that the defendant committed incest by intermarrying with his niece, and the State having shown there was no marriage, the prosecution falls to the ground. Without conceding the correctness of the proposition that a justice may not perform a valid marriage ceremony outside of his own county, we are of the opinion that the charge of incest is sufficiently proven to authorize and sustain the judgment rendered in this case.

The crime of incest, though defined under our statute (Penal Code, article 329) to be the intermarrying or carnal knowledge of persons within the forbidden degrees, does not require proof of marriage to sustain it. But where the State proves either cohabitation (that is, living together as husband and wife) or carnal knowledge, the statute declares such proof shall be sufficient proof of defendant's guilt in all cases of incest, without the proof of marriage. Penal Code, art. 332. So that when incest is charged in an indictment alleging intermarriage between persons within

the prohibited degrees, it may be proved by cohabitation, and defendant could not answer said charge by attacking the validity of the marriage, as he could in adultery or bigamy. While the statute on incest contemplated two classes of offenses, to-wit, those who lived together as husband and wife, and those having carnal knowledge without pretending to or claiming the relation of husband and wife, yet it was striking at the evil of carnal knowledge, with or without marriage, between persons within the prohibited degrees.

In the case at bar the State fully made out the case of incest by proving the cohabitation of defendant with Carrie Budde, and the fact that the officer performing the ceremony may not have been authorized to act does not change the issue, nor entitle defendant to an acquittal. Neither do we think that the fact of the officer being disqualified to act (if he was disqualified) rendered the marriage void. We are aware the rule generally laid down by the authorities is that a marriage must be proved in all cases of bigamy, adultery, and criminal conversation. 2 Greenl. Ev., sec. 461; 2 Bish. Mar. and Div., sec. 1038. Yet all that can be required in any case is proof of a valid marriage, for a violation of which the parties thereto may be punished. In our opinion the record shows such marriage.

Mr. Greenleaf, after a careful examination of all the decisions and law writers, states the rule to be, that marriage is a civil contract, to the validity of which the consent of parties able to contract is all that is required by natural or public law; and though in most, if not in all, the United States, there are statutes regulating the celebration of marriage rites, yet it is generally considered, when the State does not declare void marriages not celebrated in the prescribed way, or by certain magistrates or ministers, any marriage, regularly made according to the common law, would still be a valid marriage. 2 Greenl. Ev., sec. 460; 1 Bish. Mar. and Div., secs. 435, 449; Meister v. Moore, 96 U. S., 82.

In Hutchins v. Kimmell, 31 Michigan, 126, Cooley, J., in speaking of proof necessary in an action of criminal conversation to establish a foreign marriage, says: "Had the proposed marriage taken place in this State, evidence that a ceremony was performed with the apparent consent and co-operation of the parties would have sustained proof of marriage, though statutory regulations had not been complied with. Whatever be the form of the ceremony, or if there be no ceremony, if the parties agree presently to take each other for husband and wife, and from that time on live professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding on the parties, which would subject them to legal penalties for a disregard of its obligations. This has been the settled doctrine of the American courts, and the few cases of apparent dissent are borne down by the great weight of authority in favor of the rule stated." Mr. Cooley cites numerous au-

thorities to sustain the rule, which we think is to be commended for its common sense.

Tested by this rule, we think that in this character of case there is sufficient evidence in the record to show a valid and binding marriage between defendant and Carrie Budde, had they not been within the prohibited degrees. There was not only a marriage ceremony in which the mutual consent to live together as husband and wife was publicly solemnized, but they did live together as such, and only separated on being indicted by the grand jury in 1891, and this, under all the authorities, is sufficient to prove a valid marriage. There being no other error that need be considered, we think the judgment should be affirmed.

*Affirmed.*

Judges all present and concurring.

### ON MOTION FOR REHEARING.

SIMKINS, JUDGE.—The grounds presented for a rehearing of this cause were not presented in the brief of appellant at the original hearing, nevertheless we have examined them with that degree of care and attention demanded by the importance of the questions involved and the standing and ability of the counsel so ably presenting them.

1. We do not agree with counsel, that the indictment is " fatally defective in alleging that defendant did *unlawfully* intermarry C. Budde, because it thereby failed to charge affirmatively that there was a marriage." The indictment is correct; it charged a *marriage* and that it was an *unlawful* one.

Nor do we think it is fatally defective because it fails to charge that defendant *knowingly* entered into an unlawful marriage with C. Budde. The statute (article 329, Penal Code) does not employ the word " knowingly" in defining incest.

One of the cases referred to by appellant construes a statute similar to ours, and holds directly against appellant's position. The State v. Bullinger, 54 Mo., 143. In this case the Supreme Court held it was not necessary that the indictment should charge that defendant *knew* that the person with whom he intermarried was in any way related to him. And indeed this is in consonance with the decisions of our own court and the ordinary rules of pleadings. Willson's Crim. Stats., secs. 111, 114, 1955.

Where, however, the statutory definition contains the word " knowing" or " knowingly," the rule is different. It then becomes the duty of the pleader to set forth in the indictment that the prohibited act was " knowingly" entered into. And to this effect are the cases cited in appellant's brief. Baumer v. The State, 49 Ind., 544, and Williams v. The

State, 2 Ind., 439.   See also Barker v. The State, 30 Ala., 531; Bergen v. The State, 17 Ill., 426; Hicks v. The People, 10 Mich., 395.

2.  Nor do we agree with counsel, that "the charge of the court is fatally defective in charging that if the jury believe that C. Budde is the daughter of *a* half-sister of defendant, they should find defendant guilty, because it is a charge on the weight of evidence, and tells the jury to convict if defendant married C. Budde and she was the daughter of *any* half-sister of defendant."   It is not on the *weight* of evidence, because it did not assume that the mother of C. Budde was a half-sister of defendant.   On the contrary, the charge distinctly left it to the jury to decide whether the relationship existed or not.   The words are, "If C. Budde is a daughter of a half-sister of the defendant."   Nor is the charge susceptible to the criticism that it authorized defendant's conviction if C. Budde was the daughter of *any* half-sister of defendant.   There is no dispute or question in the evidence that C. Budde was the *only* daughter of Theresa Budde.   The witnesses for State and defendant proved that fact, and the indictment alleged it.   The charge must be looked at in the light of the evidence; and the jury could have understood nothing else from the charge in the light of the evidence but that the issue presented to them was the relationship between defendant and the *mother* of C. Budde, and not whether C. Budde was the daughter of Theresa Budde or of some other unknown half-sister of defendant.

The cases cited by appellant do not support his contention, for the reason that they simply assert that it is error for the court to charge on a phase of the case not made by the evidence.

3.  Appellant contends that the introduction of the testimony of Louis Sitterlee, that he was informed by Theresa Budde, the mother of Carrie Budde, that the said C. Budde was the half-neice of defendant, and he so informed defendant a short time before his marriage, did great injury to defendant, and certainly authorized him to introduce the declarations of *his deceased mother* to rebut the declarations of the *mother* of C. Budde; that if it is against public policy to allow the mother to impeach her own chastity, that defendant should not have evidence introduced as to information to a different purport communicated by another who was not in condition to know.

The evidence of Louis Sitterlee was not objected to nor an exception reserved to its admission, nor was any motion made to strike it out; on the contrary, Mrs. Budde took the stand and denied the statement.   What relationship was borne by the witness Sitterlee to the defendant or his family, other than being a friend, is not disclosed by the record.   He was one of the guests who went from Victoria County over to Goliad, in company with the justice, to see the marriage.   There were not many present.   An hour before the marriage he told defendant, after being so informed by T. Budde herself, that he ought not to marry C. Budde, be-

cause she was his niece. His warning was disregarded. The evidence further shows, that defendant had been partially raised after the death of his father in his sister's (Mrs. Budde's) house. That no question of his legitimacy was raised until his ill-fated affection for his niece began, and then it appears to have been discussed. The father of C. Budde goes to visit the mother of defendant, and tells her that he understands that T. Simon is not related to his wife and daughter, and that it would be a serious thing for his daughter to marry her uncle, and that thereupon *she gave him to understand* that defendant was illegitimate and she would protect him from a criminal prosecution. Without further inquiry, and relying upon this indefinite statement, the marriage is allowed to take place. Defendant's mother died before the marriage, and such a conversation was sought to be introduced on the trial to rebut the family recognition and belief that existed from defendant's birth, and his own belief (for it does not appear that defendant himself ever heard to the contrary till he wanted to marry), and the presumption of wedlock as to children born therein. It seems, however, that the justice of the peace from Victoria who went across to perform the marriage contract, after talking with the parents of the girl, decided to perform the marriage, and did so, and defendant cheerfully accepted this decision and paid no attention to the warning of Sitterlee. Whatever weight the judicial action of the justice may have in a plea for executive clemency, it can have none before this court. And the trial court, as we held before, did not err in excluding said testimony.

The motion is overruled.

*Motion overruled.*