**UNITED STATES FIDELITY & GUARANTY CO. v. HENDERSON et al.**

No. 3880.

Court of Civil Appeals of Texas. Amarillo.

Oct. 5, 1932.

Rehearing Denied Nov. 2, 1932.

812

Gibson & Sutton, of Amarillo, for appellant.

Snyder, Owen & Lybrand, of Oklahoma City, Okl., W. A. Keeling, of Austin, and W. M. Lewright, of Pampa, for appellees.

HALL, C. J.

This case arose under the Workmen's Compensation Law (Rev. St. 1925, art. 8306 et seq., as amended).

Earl Dale Henderson, while working for the Empire Gas & Fuel Company, was killed, and, upon application to the Industrial Accident Board, Mrs. Gladys L. Henderson, as the widow, and Glen Dale Henderson and Earline Henderson, as the minor children of Earl Dale Henderson, were awarded compensation for 360 weeks, one-half thereof, after deducting attorney's fees, was to be paid to the widow and the remaining one-half to be divided equally between the two children. The Fidelity & Guaranty Company appealed from the award of the board. The attorney who represented Mrs. Gladys L. Henderson was appointed guardian ad litem for the minors, and the case was tried to the court without a jury.

The minors alleged that prior to the year 1925 their mother, Mrs. Gladys L. Henderson, was married to one Clyde Wolf, from whom she separated in 1925; that at the time of her separation Wolf informed her that he intended to institute suit for divorce and that thereafter such suit was actually instituted in Oklahoma, and prior to the 19th day of November, 1925, she was informed that her husband, Wolf, had actually procured a divorce; that she had confidence in her informant and relied upon such information, and thereafter, in good faith, believing that she had been divorced, entered into a common-law marriage with Earl Dale Henderson, of which said marriage said minor defendants were born and were therefore entitled to compensation under the Workmen's Compensation Act. It is further alleged that, in the event the common-law marriage should prove to be only a putative marriage, nevertheless under the laws of Texas the said minors were the lawful children and the heirs at law of their father, Earl Dale Henderson, deceased.

The appellant company contended that the existence of the marital relationship between Gladys L. Wolf and Clyde Wolf was known both to her and Earl Dale Henderson at the time of the alleged agreement between the latter to enter into the common-law marriage relation, and that said relation was, in fact, no marriage at all, but constituted only a meretricious relationship between them, and that R. S. art. 2581, which provides that the issue of marriages deemed null in law shall, nevertheless, be legitimate, has no application to the facts of this case, and does not make said minors legitimate children because the relationship entered into between their mother and Earl Dale Henderson was not entered into in good faith.

The trial resulted in a judgment in favor of the minors for the sum of $6,728.40, payable in weekly installments, and denying Mrs. Gladys L. Henderson a recovery.

The court filed findings of fact and conclusions of law which are, in part, as follows: (a) That Gladys L. Wolf and Earl Dale Henderson in good faith entered into their agreement to live together as man and wife; (b) that Earl Dale Henderson was the father of the minor defendants; (c) and they were entitled to compensation for the death of their father; (d) that the burden of proving the invalidity of the purported marriage between Earl Dale Henderson and Gladys L. Wolf was on the appellant company; (e) that appellant had not discharged that burden and therefore the children were presumed to be the children of Earl Dale Henderson; (f) even though the so-called common-law marriage between Gladys Wolf and Earl Dale Henderson should

be invalid, that the children were, nevertheless, legitimate in law, and entitled to recover compensation on account of the death of their father.

The first proposition urged by the appellant company is that, a lawful marriage having been shown between Gladys L. Henderson and Clyde Wolf which had not been dissolved by death or divorce, children subsequently born to Gladys L. Henderson are presumed to be the children of Clyde Wolf, and this presumption can only be overcome by the strongest kind of evidence showing the impotency of the husband or nonaccess of the husband to the wife at the time the children must have been conceived, and the burden of proof is on appellees herein as the parties seeking to overcome this presumption.

Related to this proposition is the second contention, the substance of which is that a prior valid marriage having been shown between Gladys L. and Clyde Wolf, and it further appearing that Gladys L. Wolf was the mother of the two minors and she having testified to these facts, she could not then testify to any fact tending to show that her children were not the children of Clyde Wolf, for the reason that the testimony of neither the father nor the mother is admissible to prove the illegitimacy of a child nor to establish any fact tending to show that the child is illegitimate.

■ The record shows that she had been lawfully married to Clyde Wolf, and there is no testimony which shows or tends to show that this marriage had been dissolved by divorce or death. She sued Wolf for divorce after the death of Henderson. In the absence of good faith, hereinafter discussed, or competent proof of nonaccess, the presumption of Wolf's paternity of the minors obtains. She was an incompetent witness on the issue of nonaccess. The law is settled that the testimony of neither the father nor the mother is admissible to prove the illegitimacy of a child born to them in wedlock nor to establish any fact tending to show that the child is illegitimate. The testimony of the mother to the effect that Henderson was the father of her children and that she had not cohabited with Clyde Wolf since she left him was inadmissible under this rule.

As stated in Foote v. State, 65 Tex. Cr. R. 368, 144 S. W. 275, 276, Ann. Cas. 1916A, 1184: "The presumption of law is that a child born in lawful wedlock is legitimate, and at common law a married woman had no right to testify to acts of intercourse with another or nonaccess of her husband on the question of bastardy or illegitimacy of her child. The reason for this, as stated in the phrase of Lord Mansfield, is based on decency, morality, and public policy, and neither husband nor wife should be allowed to bastardize a child of the wife by showing acts of adultery on the part of the wife, or the nonaccess of the husband. The testimony is rejected, not so much from the fact that it would reveal the immoral conduct of the mother, as because of the effect it would have on the unfortunate child, who is not at fault, but who would be the chief sufferer. In regard to the testimony of the mother not being admissible, it has been clearly decided by this court in Simon v. State, 31 Tex. Cr. R. 186, 20 S. W. 399, 716, 37 Am. St. Rep. 802, in which it is held that the mother and father will not be permitted to testify to any fact which would render children born in lawful wedlock bastards." See, also, Meyer v. State (Tex. Cr. App.) 41 S. W. 632; Edelstein v. Brown, 100 Tex. 403, 100 S. W. 129, 123 Am. St. Rep. 816; Schwingle v. Keifer, 105 Tex. 609, 153 S. W. 1132; 40 Cyc. 2222.

Pinkard v. Pinkard (Tex. Civ. App.) 252 S. W. 265, Moore v. Moore (Tex. Civ. App.) 299 S. W. 653, and McCulloch v. McCulloch, 69 Tex. 682, 7 S. W. 593, 5 Am. St. Rep. 96, are three civil cases which hold that declarations of the mother or father are inadmissible upon the issue of the legitimacy of their children. If their declarations are inadmissible, then upon the same basis direct testimony from either should be excluded.

■ The appellees' counsel insisted that the mother's testimony was admissible for the purpose of showing the legitimacy of her children, and the trial judge evidently accepted that view. In this there was error. The validity of the mother's prior marriage with Clyde Wolf is conceded, and it is also conceded that Earl Henderson had been married prior to the time when he commenced to cohabit with Gladys L. Wolf. She testified that Henderson had been divorced from his first wife, but there is no further testimony to that effect. While a ceremonial marriage may be established by general repute, by circumstances, by the testimony of a witness, and also by hearsay, such testimony is not admissible to establish the fact of a divorce. A common-law marriage may also be established by testimony of a like kind, but the best evidence of a divorce is the decree of a court of competent jurisdiction.

The testimony of Mrs. Wolf was inadmissible to establish the fact that Henderson had been divorced from his first wife. Even if it is conceded that Mrs. Wolf's marriage with Clyde Wolf had been dissolved, nevertheless her relations with Henderson were necessarily meretricious because he, according to the record, was the husband of another woman at that time.

■ This record is teeming with incompetent and inadmissible testimony in response to questions that were leading and which assumed the existence of facts that had not been established. The fact that most of it was admitted without objection does not ren-

der it competent or relevant, and it gains no vitality because admitted without objection, and neither this court nor the court below could consider it in support of a judgment or to form the basis of a finding of fact in the appellate court.

Evidence which is inherently incompetent is without probative force and whether admitted over objection or otherwise it will not support a verdict or a finding of fact nor form the basis of a finding of fact in an appellate court. This is true, for example, of hearsay evidence, or testimony which is a bare opinion or conclusion of the witness without any disclosed basis of fact. Henry v. Phillips, 105 Tex. 459, 151 S. W. 533; Austin Bros. v. Patton (Tex. Com. App.) 294 S. W. 537; Id. (Tex. Com. App.) 290 S. W. 153; Id. (Tex. Com. App.) 288 S. W. 182; Webb v. Reynolds (Tex. Com. App.) 207 S. W. 914. If the trial court considers such evidence, the appellate court is not bound by such action. Vaughn v. Vaughn (Tex. Civ. App.) 287 S. W. 687.

By its third proposition the appellant insists that under section 8a of art. 8306 of the Revised Statutes, which states who may be the beneficiaries in case of the death of an employee under the Workmen's Compensation Act, the phrase "children of a deceased employee" are necessarily legitimate children, and illegitimate children are not recognized as beneficiaries.

■ This proposition must also be sustained. Sanchez v. Texas Employers' Insurance Company (Tex. Com. App.) 51 S.W.(2d) 818; Travelers' Insurance Company v. Peters (Tex. Civ. App.) 280 S. W. 310.

"A common-law marriage as that term is now understood in this state is one not celebrated according to the prescribed forms of statute law, but one which arises from the agreement between capable contracting parties to become husband and wife, followed by an actual assumption of that relation; in other words, it is the agreement of capable parties together with cohabitation as man and wife. It will be observed that here, as in the case of statutory marriage, the parties must be competent and there must be no impediment by reason of statute or otherwise forbidding the marriage. Where parties assume the marital relations, each knowing of an impediment preventing a valid marriage between them, the union is not a marriage at all, but the relation is merely meretricious, the parties are not husband and wife." Speer's Law of Marital Rights, page 32, § 28.

■ The record showing that both Henderson and Gladys L. Wolf had been previously married, neither was capable of contracting a second marriage, either ceremonial or common law, in the absence of proof showing the death of their respective spouses or a dissolution by divorce proceedings. The only testimony showing a dissolution of Henderson's prior valid marriage is the statement by Mrs. Gladys Wolf, which must necessarily be hearsay. There is no testimony in this record which tends to show that Earl Dale Henderson and Gladys L. Wolf entered into their alleged marital relationship in good faith. They both knew that they were married to other parties from whom they had not been divorced, and, so far as the record shows, their spouses were each alive. She testified that she told Henderson that she had been previously married and told him all the facts concerning her marriage to Wolf, and she further stated that the only information she had as to whether or not Wolf had obtained a divorce was his threat to obtain one when she abandoned him and a letter she had received from her friend, Mrs. Tussig, which stated that the writer had heard that Wolf was going to get a divorce. As an illustration of the utter poverty of the testimony and its incompetency and inadmissibility, we quote from the statement of facts as follows a part of her direct testimony in response to questions propounded by her attorney:

"Q. Did you or not tell Mr. Henderson prior to Nov. 19, 1925, [when their relationship commenced] that Mr. Wolf had gotten a divorce? Is not it a fact that you told him he had gotten a divorce?

"Mr. Gibson, Attorney for Appellant: I think that counsel is violating the rules. He is not only asking a leading question but I think he is doing it deliberately and I object to the question as certainly being leading.

"The Court: Don't lead the witness. Ask her what she told him.

"Mr. Lewright: All right.

"Q. Mr. Gibson asked you whether or not you told Mr. Henderson the full facts; that is, the facts you have detailed here before the Court. Did you ever have occasion to go into all of this rigmarole with Mr. Henderson? A. Not all that. Nothing like that, of course not.

"Q. When you married Mr. Henderson, as far as you know, did he think you were a single woman and entitled to enter into the marriage relations with him? A. Of course he felt that way.

"Mr. Gibson: She testified directly contrary to that and the question is entirely leading and I think is improper.

"The Court: Don't lead the witness.

"Mr. Gibson: That calls for a conclusion of the witness and we offer that objection to it.

"The Court: To a certain extent it does. You can answer that yes or no.

"A. Well, he knew I had been married, of course."

It is generally proper for a witness or a party to state what they know or believe or thought or testify to their motives or intentions, but a witness is not permitted to testify as to the belief, feelings, knowledge, or intentions of another party. McClory v. Schneider (Tex. Civ. App.) 51 S.W.(2d) 738; C., R. I. & T. Ry. v. Long, 26 Tex. Civ. App. 601, 65 S. W. 882; Robertson v. Gourley, 84 Tex. 575, 19 S. W. 1006. A witness may testify as to statements or conduct which manifest the knowledge, motive, or belief of another party, but, when Mrs. Wolf testified that Henderson felt when he began to cohabit with her that she was a single woman and entitled to enter into the marriage relations with him, the testimony should have been excluded, and the objection that the question called for a conclusion should have been sustained, but the court permitted her to state what he knew and believed and felt.

This question is followed by Mr. Lewright, who said:

"Q. I did not ask you that. Listen to my question. As far as you know on November 19, 1925, when you and Mr. Henderson agreed to live together as man and wife, did Mr. Henderson think you were a single woman and able to marry? A. Sure he did.

"Mr. Gibson: We object to that, if the Court please, as being responsive to a leading question and also being the conclusion of the witness.

"The Court: To a certain extent, yes.

"Mr. Gibson: And for the further reason that she has testified that E. D. Henderson knew that she had been married and that she had told him all the facts and that she had merely been told that he was going to get a divorce.

"Mr. Lewright: I don't think that she testified that she told him everything. That may mean a whole lot. That is the reason I asked the preliminary question whether she ever had occasion to sit down there with this man and go over it with him, because it seemed unreasonable to me that any man, under the circumstances, would sit there and discuss that kind of a thing—

"Mr. Gibson (interrupting): I am objecting to this manner of argument before the witness.

"The Court: Gentlemen, this is before the Court, but I am going to let the answer stay in there.

"Mr. Gibson: Exception."

The record shows that the court did permit the answer and based his finding upon it.

The examination proceeded further as follows:

"Q. (by Mr. Lewright): All right, before November 19, 1925, did you not tell Mr. Henderson that you had gotten a divorce or that you thought you had gotten a divorce? A. Well, I thought the divorce had been gotten."

The record shows that the only ground upon which she could have thought that Wolf had obtained a divorce decree was her former statement that he said he would sue her for a divorce and her testimony as to the contents of an unproduced letter from Mrs. Tussig. The letter was not in evidence, and her testimony based upon it was hearsay of the rankest kind. Even if she ever received such a letter from Mrs. Tussig, stating that Wolf was going to get a divorce, her testimony was secondary evidence, Mrs. Tussig's statement was hearsay, and her source of information not being disclosed was hearsay two degrees removed, and we cannot believe that she thought that any divorce had been granted to Wolf. It is a case of where the wish was father to the thought. After her statement that she thought the divorce had been granted, her counsel asked her this question:

"Q. As far as you know, did he believe you? A. Well, yes he did, he believed it."

Based upon the authorities cited above, this was improper testimony.

"Q. Did he ask you to make any investigation? A. No, sir, he did not.

"Q. Was there any discussion between you as to whether or not you should make an investigation or as far as you know did he rely upon your statement? A. He relied on my statements.

"Q. Did you or not tell him of your conversation with Mrs. Tussig that she had been informed that Mr. Wolf had gotten a divorce from you?

"Mr. Gibson: We object to that as being a misstatement of any fact brought out in this testimony.

"Mr. Lewright: I believe she said she heard he had got a divorce.

"A. That is all I said.

"The Court: Don't lead the witness.

"Q. (by Mr. Lewright): Did you or not tell Mr. Henderson—and if this is leading I don't know how to ask it—did you or not tell Mr. Henderson what this lady you say told you? A. Yes, I did.

"Q. Did he know that, before November 19, 1925, and on Nov. 19, 1925? A. He most certainly did. He did know it. Mr. Henderson was a man who knew pretty well what he was doing.

"The Court: Just answer the question.

"A. My husband is not here to defend us. You all understand that.

"Q. You stated on Nov. 19, 1925, the time that you and Mr. Henderson had agreed to become husband and wife, that Mr. Henderson thought you were a single woman and

able to contract a marriage with him? A. I did.

"Q. What made him think that so far as you know? A. From what I told him.

"Q. All right, what did you tell him? A. I told him that my friend told me that he was going to get a divorce.

"Q. You are getting excited. Your friend did not say that.

"Mr. Gibson: If the Court please, I object—

"Mr. Lewright (interrupting): I will ask her in a few minutes. Let her get her nerves back together.

"Mr. Gibson: I am objecting to his way of examining the witness and disputing the witness.

"The Court: It casts no reflection whatever upon you or your husband, Mrs. Henderson, but it is for the purpose of finding what the facts are.

"Q. (by Mr. Lewright): You have testified that your husband Clyde Wolf told you at the time you separated that he was going to get a divorce and then you testified that you received a letter from this lady in which she said she had heard that he had got a divorce.

"Mr. Gibson: I appeal to the reporter's notes as there has been no such testimony as that by Mrs. Henderson.

"The Court: Let him finish this question.

"Q. (by Mr. Lewright): What did you hear from the lady that you say wrote you the letter? What did she tell you? A. She stated that she had heard—Of course, Mr. Lewright, she did not say how she heard it.

"Q. What did she say that she heard?

"The Court: Just tell what this lady told you.

"A. That Mr. Wolf was going to get a divorce; she did not know; she had heard it.

"Q. I thought she stated that she heard that he had got it. You say that the lady wrote you that she had heard Mr. Wolf was going to get it? A. Yes.

"Q. And not that he had got it. A. No.

"Q. Did you tell Mr. Henderson that? A. I did."

■ It appears from her cross-examination and re-cross-examination that the only information Henderson had at the time he entered into the criminal relations with Mrs. Wolf was received from her, and, notwithstanding the grilling through which she passed, she finally testified that Mrs. Tussig told her that Wolf was going to get a divorce, and under such circumstances there can be no good faith on the part of either Henderson or Mrs. Wolf. Their relations which resulted in the birth of the two children were criminal, if the record before us is to be believed. It is true that, if their relations were meretricious in the beginning, that they subsequently might have entered into a common-law marriage, provided there was no impediment and they were capable of contracting such a marriage, but, under the record before us, showing an utter absence of good faith and the existence of impediments preventing a valid common-law marriage, their cohabitation was illegal, and the children, unfortunately, are illegitimate, and cannot recover in this action.

■ A putative marriage is one which has been contracted in good faith and in ignorance of some existing impediment on the part of at least one of the contracting parties. Three circumstances must concur to constitute this species of marriage: (1) There must be bona fides. At least one of the parties must have been ignorant of the impediment, not only at the time of the marriage, but must also have continued ignorant of it during his or her life. (2) The marriage must be duly solemnized. (3) The marriage must have been considered lawful in the estimation of the parties or of that party who alleges the bona fides.

■ When all of the illegal and inadmissible evidence in this case has been eliminated, it is clear that there is no proof of either a putative or common-law marriage. As shown by the foregoing summary of the court's findings, the holding is that a common-law marriage existed. This being true, the amount awarded should have been one-half to Mrs. Wolf, and the decree should have divided the other half equally between the minors. As stated, Mrs. Wolf was denied any recovery, and the whole amount of compensation claimed under the policy was decreed to the children. This judgment is contrary to the findings and conclusions, and is not supported by the facts, and is therefore erroneous upon that ground.

We deem it unnecessary to discuss the other propositions urged, since the judgment must be reversed, and the cause remanded for another trial.

Reversed and remanded.