Commonwealth *v.* Watts, Appellant.

Argued March 31, 1955. Before RHODES, P. J., ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ. (HIRT, J., absent).

*Stephen J. McEwen,* with him *Francis R. Lord,* for appellant.

*Ernest L. Green,* Assistant District Attorney, with him *Joseph E. Pappano,* First Assistant District Attorney, and *Raymond R. Start,* District Attorney, for appellee.

OPINION BY GUNTHER, J., September 30, 1955:

The defendant was tried on an indictment charging fornication and bastardy. The prosecutrix testified that she had intercourse with defendant three times, the last time being sometime in September, 1953. The

child was born August 6, 1954. Defendant was found guilty, an order of support was entered, and defendant has appealed.

Appellant's primary contention is that the medical testimony was insufficient to sustain the conviction. The medical testimony was given by the doctor who delivered the child. She testified that the normal gestation period is nine months or 282 days, give or take two weeks either way. The defendant admitted having intercourse and asserted that the last time occurred on September 21, 1953. If the latter date is correct, the gestation period would have been almost 320 days. The prosecutrix testified that she did not have intercourse with any other man during the possible gestation period. Defendant now complains that even assuming conception on the last day of September, as from the testimony of prosecutrix, the gestation period would be 310 days, which is longer than any outside limit given by the medical witness.

The court charged the jury that the field of medicine has found that gestation can vary from 220 to 330 days, the average being 270 days. This charge is alleged to be error and defendant cites several cases to sustain his contention that the possible gestation period must be related to the testimony given. In *Com. v. Jodlowsky,* 163 Pa. Superior Ct. 284, 60 A. 2d 836, a conviction of bastardy was reversed where the gestation period was allegedly 252 days and the only medical testimony gave a leeway of from 260 to 340 days. However, in that case the prosecutrix admitted relations with another man within the period given by the medical witness. The case at bar is thus distinguishable in that this prosecutrix denied having relations with others. The primary factor in a case of that type is that the jury will not be allowed to guess, nor the mother to choose, where more than one man could

be the father. *Com. v. Young*, 163 Pa. Superior Ct. 279, 60 A. 2d 831. The *Young* case authorized the court to take judicial notice of accepted medical opinions in respect to duration of pregnancy, and the court below in this case used the same time span in its charge as that approved in *Com. v. Young*, supra. Defendant's other citation, *Com. v. Rex*, 147 Pa. Superior Ct. 121, 24 A. 2d 98, is subject to the same distinctions in that there the mother had intercourse with others within the possible period. Further the medical witness in this case was never specifically asked for the medically accepted time span for the duration of pregnancies. Her remark that there could be a two weeks leeway in either direction was obviously a quick generalization. The pregnancy here occurred within the medically accepted time possibilities and the jury was properly charged.

It is also contended that the Commonwealth was precluded from proving a fruitful coition at a time other than that charged in the indictment. This was answered in *Com. v. Blank*, 79 Pa. Superior Ct. 49, in which we held that it was sufficient to prove illicit intercourse about the time the child must have been begotten in order to convict of bastardy.

The final assignment of error is the failure of the court below to instruct the jury that the defendant was charged with two separate crimes, fornication and bastardy. This issue was not raised in the court below and no exception was taken to the charge in this respect. In such event only fundamental error can be complained of on appeal. *Com. v. DiCarlo*, 174 Pa. Superior Ct. 611, 101 A. 2d 410. The error here is not fundamental in view of the fact that the judge clearly and separately defined each offense.

Judgment of sentence and order of support affirmed.

DISSENTING OPINION BY WOODSIDE, J.:

I do not agree with the majority in this case.

The defendant was charged with bastardy. He should not have been convicted unless the evidence established his guilt beyond a reasonable doubt. It is my opinion that incontrovertible facts raise a reasonable doubt as to his guilt,—and that the true significance of these facts was not only withheld from the jury, but so presented as to mislead it.

The prosecutrix testified that she had sexual intercourse with the defendant three times during the month of September 1953, and not thereafter. A letter introduced by the Commonwealth indicates the defendant was in North Carolina and the prosecutrix in Pennsylvania during the last two days of September. The child was born August 6, 1954. That was 312 days after the 28th of the previous September.[1] At the hospital she gave her last menstrual period as October 27, 1953.[2] That was 283 days before the birth. She testified that she had sexual relations with no other men during September, October and November of 1953. She was not asked about December, the first day of which was 248 days before the birth.

---

[1] The defendant admitted having sexual intercourse with the prosecutrix, claiming the last time to be September 21. The defendant was in the military service, stationed at Edenton, N. C. and there is some indication that the sexual relations were limited to weekends. The last Sunday in September 1953 was on the 27th.

The prosecutrix testified twice on direct examination without equivocation that she did not have sexual intercourse with the defendant after September. On cross-examination she said, "I'm not certain. I mean the only way I can tell is by these letters and by that I think so. Q. And those letters would indicate that would be September? A. Yes, by those letters."

[2] She said in her testimony that she had a menstrual period in September and two in October, "but they weren't normal."

There was no evidence concerning the length, weight or condition of the child at birth, and no evidence concerning the prosecutrix's pregnancy except that relating to her last menstrual period.[3]

I should like to make it clear at the outset that *I do not* think it is *impossible* for this child to be the child of the defendant. I do think that the probability of its being his is so extremely *remote* that it raises a doubt which should permit a conviction only after the jury is fully advised of the improbability of such a protracted period of gestation.

The purpose of the trial in this case was to determine whether the defendant *was* the father of the child born to the prosecutrix, not whether he *could have been*. We are thus dealing with probabilities and not possibilities.

What are the chances of a birth being the result of sexual intercourse 312 or more days before the date of birth?

Not one chance in a million!

Although admittedly it cannot be known with mathematical certainty, an examination of the authorities and an analysis of the recorded cases of prolonged pregnancies indicate that a pregnancy of the length here supposed is not likely to happen one time in some millions of births.

Before considering any of the authorities on the duration of pregnancy we should note that time is com-

---

[3] As pointed out in *Commonwealth v. Young*, 163 Pa. Superior Ct. 279, 60 A. 2d 831 (1948), although a protracted or a shortened pregnancy often has its effect on the physical development of the child at birth, it is not invariably so, and since such evidence would not be controlling its absence is not a serious matter. It does seem to me, however, that evidence of this type would help the court and jury get to the truth, if medical testimony were given so that the condition of the child at birth, and of the mother during pregnancy, could be properly evaluated.

puted from the date of three different occurrences in the life of the mother; one is the first day of the last menstrual period, one is the time of intercourse, and one is the time of fertilization of the ovum. As the three occurrences usually take place on different dates, care should be taken not to confuse the number of days figured from the different occurrences. Both medical authorities and courts have been careless in their comparisons.

Computing from the last menstrual period is an inaccurate test of the actual time of conception, but it is the most practical way to predict the date of birth in most cases, and is the time recorded in most records and studies of the duration of pregnancies.

Although some authorities think it is *possible* for the fertilization of the ovum to be delayed a week or more after intercourse, such delay is very unusual, and some authorities believe the delay does not exceed 24 hours.[4]

What we are concerned with here is the time between intercourse and birth.

H. L. Stewart, M.D., of Detroit recently made a study of the duration of pregnancy using modern means of determining the time of ovulation, which is generally accepted as the time of conception. His tests showed that the period from ovulation to birth ranged from 250 to 285 days. Although his tests indicated a limit of 285 days, he concluded from his study that "Decisions establishing paternity within a period of 300 days from the last coitus are reasonable, but longer periods seem most questionable, and are conspicuous by the complete absence of any supporting data from this study." Journal of American Medical Association (March 29, 1952).

---

[4] E. J. Harris; Human Fertility and Problem of the Male (1950) p. 144.

In a letter published in the Journal on July 12, 1952 Lester M. Levy, M.D., of the Philadelphia General Hospital, suggests that Dr. Stewart's tests show that one case in 3,400,000 births is likely to equal 310 days duration of pregnancy and one in 31,000 is likely to equal 301 days.

Nicholson J. Eastman, M.D., a professor of Johns Hopkins University, states in the 10th edition of Williams Obstetrics (1950) "The average duration of human pregnancy, counting from the first day of the last menstrual period is about 280 days or 10 lunar months. Since the interval between the first day of menstruation and ovulation averages approximately 13 days, the mean duration of actual pregnancy, counting from the day of conception must be close to 267 days."

He refers to a record of 144,079 cases in which only 42 had pregnancy extending more than 31 days after the expected date. This would mean that only 3 cases out of a thousand had pregnancies extending more than 298 days computed from conception to birth.

In 1943 a book written by J. H. Kenneth was published dealing with cases of prolonged pregnancy, collected from world literature and listing therein a pregnancy of 331 days from the menstrual period.

In an article in the American Journal of Obstetrics & Gynecology, Vol. 62, Page 458 (1951) Reginald A. Smith, M.D., A. Albert, M.D., and Robert B. Wilson, M.D. of the Mayo Clinic pointed out that Kenneth's collected cases were all "based upon circumstantial evidence" but that they had knowledge of a pregnancy confirmed by laboratory tests in which the birth was 310 days after the first day of the last menstrual period. It is noted that this presumably would be less than 300 days after fruitful intercourse. It is our

understanding that this is the longest known pregnancy confirmed by laboratory tests.

Dr. Fred J. Taussig of St. Louis, Mo. in the American Journal of Obstetrics and Gynecology, Vol. XLIV, Page 519 (1942) reviewed 61 cases of prolonged pregnancy collected from world literature. Wharton & Stille's, Medical Jurisprudence Vol. III (1905) also collected and reviewed cases of prolonged pregnancy known to medical literature. Among these cases can be found some, considered authentic by medical authorities, in which birth was more than 312 days after intercourse. The number of such cases, however, in all of modern medical history has not exceeded approximately a dozen.[5] The cases collected by these authorities are from prior to 1867 to the present time and from all over the western world. During that time there were hundreds of millions of births attended by physicians who in most cases would have been quick to report such an unusual medical phenomenon.

A review of authorities on this question can be found in Re: McNamara, a California case reported in 7 A.L.R. 313, 319, 320.

A study of these and other authorities substantiates the conclusion that the chance of a birth being caused by intercourse 312 days earlier is less than one in a million.

There is a *possibility* that the mother is telling the truth when she says the child was conceived in September, but with the improbabilities of such a protracted pregnancy, is not there a *reasonable doubt of the defendant's guilt?* Is not the probability of the mother withholding information concerning a subsequent in-

---

[5] It is difficult to determine this number accurately because nearly all such cases are figured from the first day of the last menstrual period.

tercourse with another man so much greater than the probability of her pregnancy lasting 312 days that by the mere comparison of probabilities, a reasonable doubt of the defendant's guilt is created?

There is, of course, a presumption that the witness is telling the truth, particularly in light of the jury's findings. Nevertheless, it must be remembered that the outcome is extremely important to her. Assuming the order continues at its present rate until the child is 18, it will involve over $7500. Furthermore, whether she ever had intercourse with another man about the time of conception is a fact which she could hide from the court and the defendant with ease, and with little fear of ever being caught.

Having examined the medical authorities and the probabilities which they indicate, let us now examine the law.

It is interesting, if not relevant, to find the statement that Scotland, France and Italy define 300 days as the maximum time for legitimacy in contested paternity cases and that in Austria the law recognizes the legitimacy of a child born 307 days, in Germany 302 days, and in Switzerland 300 days after the death of the husband.[6] England has no such limits. Its law, unchained to science or reality, was let free to hold during the time of Edward II that the child of the Countess of Gloucester born *one year and seven months* after the death of the Duke was legitimate. That the absurdities knew no bounds in the land and age of chivalry is shown by the opinion of Baron Rolfe expressed, it is said, with apparent gravity during the reign of Henry VI that a widow might give birth to a

---

[6] Taken from Wharton and Stille's Medical Jurisprudence, Vol. 3 Chapter III and Witthaus & Becker Medical Jurisprudence Forensic Medicine and Toxicology, Vol. II, page 514, but not checked against official legal reports of these countries.

child *seven years* after her husband's death without injury to her reputation. 7 A.L.R. 330.

It may be that our present problem is one with which the Legislature should deal,[7] but since it has not done so it is incumbent upon the courts to provide for trials which will be reasonable and just; in other words, to establish rules of evidence and rules of law which will aid in the determination of truth.

Rules of evidence are not always adopted as an aid in the determination of the truth. Some rules obstruct rather than facilitate the search for truth and become a part of the law for some purpose believed to be more important than the determination of truth. Thus the rules which make confidential the communications between husband and wife, lawyer and client, priest and parishioner, may defeat rather than aid the determination of the truth at a trial, but they perform the more important function of establishing a desired relationship between these parties. The rule denying parents the right "to bastardize their issue", so universally adopted and applied, although sometimes criticized,[8] is not for the purpose of establishing the true paternity of children, but to strengthen family ties by making difficult the questioning of the paternity of children

---

[7] In 1705 Pennsylvania passed a statute, not relevant here, which provided as follows: "If any married woman within this province shall be convicted of having a child born of her body, in the absence of her husband, and shall not be able, by credible evidence, to prove that her husband has cohabited or been in company with her, or has been in some of the Queen's colonies or plantations in this continent, betwixt the easternmost parts of New-England and southernmost part of North-Carolina, within twelve months next before the birth of such child, such woman shall be punished as an adulteress." General Laws of Pa. (Dunlop) 1700-1846 page 15, 1 Sm. L. p. 27.

[8] See Wigmore on Evidence, Third Edition, Vol. VII, page 358 et seq.

born during wedlock, unless their legitimacy was clearly impossible.

But we are not faced in this case with the problem of formulating rules for sociological effects. It is our duty to formulate rules which will aid in the determination of the truth—not defeat it.

In this respect the matter before us differs materially from many of the cases cited on this subject. As the difference is oftentimes ignored—vital as it is—I deem it important to dwell upon it.

The length of time between intercourse and birth is sometimes the focal point in divorce or criminal cases involving the charge of adultery against the mother. There is, not only the very strong presumption of legitimacy in such cases, but as we have pointed out above, the applicable rules are made for sociological reasons and not as an aid to the determination of the truth. In furtherance of this presumption of legitimacy, the courts have held that the child is legitimate (the wife innocent) unless it would be *impossible* for the child to have been that of the husband—or in other words unless it was *impossible* for pregnancy to last as long as the time between the last possible intercourse between husband and wife and the birth of the child.[9] These cases hold that the wife should not be deemed guilty of adultery either in a divorce or a criminal action unless it is *impossible* for the child to be the husband's. They deal with possibility, not probability. They deal with the quantum of evidence necessary to overcome the presumption of legitimacy and not the quantum of evidence necessary to raise a reasonable doubt. There is a vast difference. Ignoring this difference is one of the errors of the majority.

---

[9] An example is *Gaskill v. Gaskill* (L.R. (1921) Prob. 425.) an English case reported in 21 A.L.R. 1451 and cited in *Commonwealth v. Young*, supra.

Now let us turn to the law in Pennsylvania.

The most recent decisions of this Court bearing upon the problems of the instant case are *Commonwealth v. Young*, 163 Pa. Superior Ct. 279, 60 A. 2d 831 (1948); *Commonwealth v. Jodlowsky*, 163 Pa. Superior Ct. 284, 60 A. 2d 836 (1948); and *Commonwealth ex rel. Ranjo v. Ranjo*, 178 Pa. Superior Ct. 6, 112 A. 2d 442 (1955). In both the *Young* and *Jodlowsky* cases, decided the same day, convictions of bastardy were reversed.

In the *Young* case the evidence indicated that the prosecutrix had intercourse with the defendant 255 days before birth and with another man by the name of Freeman, 290, 297 and 304 days before the birth. On the second day of the trial the mother repudiated her testimony as to the intercourses 290 and 297 days before birth.

Judge HIRT, speaking for this Court said: "It is a reasonable inference from the testimony given by her on the first day of the trial that Joseph Freeman is the father of her child. And it is at least doubtful that her changed testimony on the following day excludes that possibility.

"Medical authority in general is in agreement to this effect: *that while on the average the normal duration of pregnancy in the human female is 280 days, yet the period of gestation may last only 240 days or extend to 300 days or longer . . .*"

The above italicized statement is the expression of this Court on the subject before us. It is to be noted, however, that the 280 days is the time generally accepted as the time from the first day of the last menstrual period rather than from the date of fruitful coition.

Examining the first above quoted sentence we find this Court said in effect: "It is a reasonable inference"

that the man having intercourse with the mother 290 days before the birth "is the father" and "it is at least doubtful" that an intercourse 304 days before birth "excludes the possibility."

Judge HIRT after making the above quoted statement went on to review several cases and quote from various medical textbooks. Among those was a quotation from DeLee-Greenhill, Principles and Practice of Obstetrics, Eighth Edition (1943), p. 96, as follows: "The most reliable datum from which to estimate the beginning of pregnancy is the date of fruitful coition, and, reckoning from this day, pregnancy has been found to vary from two hundred and twenty to three hundred and thirty days, the average being two hundred and seventy days."

This is not a statement of law to be given to the jury. Neither it nor any of the other references in that case to medical authorities were ever intended, in my opinion, to be given to the jury as a statement of law or of fact. Not only does the quoted medical authority differ in language and meaning from the court's statement as to what medical authorities "generally" hold, but reading from a medical book to the jury should not be allowed as we shall hereafter point out.

This Court quite properly held in the *Young* case that there was a reasonable doubt as to whether the father of the child was Young, who had intercourse with the mother 255 days before birth, or Freeman, who had intercourse within 290 days, or at the most 304 days, before the birth.

In the *Ranjo* case, finding that the lower court had ignored the above quoted statement of Judge HIRT, and instead used as the law a quotation from one of the medical authorities referred to in the *Young* case (as did the trial judge in the instant case although using

a different authority) this Court said: "under no circumstances should (the *Young* case) be used as authority for a possible period of more than 304 days."[10]

In the *Jodlowsky* case, supra, the prosecutrix had intercourse with the defendant 252 days before the birth of the child and with another man 302 days before the birth. The medical testimony in the trial was that the period of gestation is from 260 to 340 days. This Court held "it clearly appears that in light of the meagre and incomplete medical testimony appellant was not the father of the child. Any intercourse by appellant was not within the period of gestation as testified to by the medical witness, to wit, 260 to 340 days." That case was *governed by the medical testimony presented in evidence,* even though it was "meagre and incomplete",—and we might add, in some respects contrary to generally accepted authority.

Now let us examine the record in the instant case.

It is admitted by the prosecutrix that from the beginning the defendant denied paternity of the child.

As has been stated above, the last possible date under the evidence when the defendant could have had intercourse with the prosecutrix was September 28, 1953, although there is a doubt—quite reasonable—that it was later than the 27th. Assuming, however, that it was the 28th, the time between the intercourse and birth would be 312 days.

The prosecutrix testified that she menstruated in September and twice in October, the second and last time being October 27, 1953. This is also the date she gave as her last menstrual period at the hospital. This would be some indication, although not conclusive, that

---

[10] Judge HIBT did not participate in the instant case, but did participate in the *Ranjo* case.

conception occurred *subsequent* to that date. Given this information before the child's birth, any physician would have assumed the prosecutrix became pregnant from an intercourse in November, and according to the medical testimony of this case and the generally accepted method of counting, would have expected the child approximately 282 days thereafter. The physician *would have thus calculated the birth within ten hours of the time when the child arrived.*

At the close of the Commonwealth's case counsel for the defendant demurred to the evidence on the ground it was impossible for the defendant to be the father. The court, miscalculating the time from intercourse to birth by one month, said: "If this intercourse occurred the very last day of September it would be possible that this child could be born the very last day of July and still be within an exact nine month period, but if we allow several days for the life of the spermatozoa, and I believe it can live some length of time, then the difference of six days disappears." The time, of course, was ten months and six days and not nine months and six days.

The only medical testimony came from Dr. Editha Torrano, a resident physician of the Delaware County Hospital, who delivered the child.

If we were to follow the *Jodlowsky* case the medical testimony would govern the instant case. Therefore, I shall quote all her testimony bearing on the length of pregnancy. It follows: "Q. Now, Doctor, what is the normal time or normal period of pregnancy? A. Nine months. Q. Assuming, Doctor, that a young lady had presented a history to you as having some menstrual period in September, around September 29th of 1953, and then she has a menstrual period about the 27th of October 1953; now, having this history of menstruation in mind, when would you say that the period

of pregnancy would begin? Mr. Green: Objected to, . . . The Court: I think, Mr. Green, we will overrule your objection . . . By Mr. McEwen: Q. When would you start counting the nine months or 282 days? A. I would start from the last menstrual period. Q. If the last menstrual period was October 27, 1953, you would start counting from then? A. Yes. Mr. McEwen: That's all. By the Court: Q. Doctor, there have been many cases on record where there has been a showing or menstrual flow after conception has taken place? A. Yes there is. Cross-Examination. By Mr. Green: Q. And there have also been numerous cases, have there not, Doctor, where the normal nine month period was extended? A. Yes. Q. Over additional time? A. The period of counting from the last period is just theoretical, it just gives the doctor an idea when to confine the patient. It can be two weeks earlier or two weeks later than the expected date. By the Court: Q. That is just so the doctor won't go fishing on that particular date? A. That's right. Re-Direct Examination. By Mr. McEwen: Q. The fact that there was bleeding, which the young lady admitted, in September, the latter part of September 1953 and then a menstrual period a month later, doesn't that have some significance in your opinion? A. No."

In charging the jury on the law the trial judge said: "The question of that period of gestation has arisen and you have heard, I think, some of the things which I have said in connection with it. I want to say something more."—The only two things that he had said in connection with it that we could find were: (1) the above quoted erroneous statement made in refusing the demurrer; (2) a statement made in the charge concerning the doctor's testimony as follows: "She says *unequivocably* that the appearance of the menses in September and October is of no significance *whatso-*

*ever* so far as the period of gestation in this case is concerned." (Underscoring ours)

After the above reference to what he had previously said, the trial judge charged as follows:

"The legal medicine and toxicology recognizes that evidence of menstruation one month after intercourse can frequently mean or rather it is possible for that to happen and pregnancy still flow from that coitus previously and that evidence has been accepted by courts from time immemorial. Some of the noted British writers on the subject have spoken and we think that *possibly the best medico-legal data that we have* on it is probably this:

'The most reliable datum from which to estimate the beginning of pregnancy is the date of fruitful coition, and, reckoning from this day, pregnancy has been found to vary from two hundred and twenty to three hundred and thirty days, the average being two hundred and seventy days.'

So you see the medical writers from case histories would indicate that this is possible and *the doctor says definitely that it is,* but that, of course, is also for you." (Emphasis ours)

This again was a serious misstatement of fact, for the doctor did not say, "definitely" or otherwise, that it was possible to give birth to a child more than 312 days after intercourse. This alone, in my opinion, is reversible error for it strikes at the very heart of the defense, and timely exception was taken to it.

But even more important, it was certainly error for the trial court to have quoted from a medical book in his charge. Medical books or treatises are not admissible to prove the truth of statements therein contained, even when they are properly identified and authenticated and even when it is shown that they are recognized as standard authorities on the subject to which

they relate. This rule, supported by many cases, is recognized in all states in which the question has arisen except in Alabama. 65 A.L.R. 1102, and cases there cited. Thus the quotation from the English author which the trial court read to the jury could not have been introduced into evidence. 32 C.J.S. Evidence §718 and cases there cited. How much greater is the error when the court reads to the jury that which could not even have been introduced into evidence? If the lower court's error had been admitting the quotation into evidence, at least the defendant would have had the opportunity to rebut or explain it. Even that opportunity was denied him in this case.

In permitting the trial judge to quote from a "learned treatise", the majority is revolutionizing the whole field of opinion evidence. If it is permissible to quote from medical books in criminal cases, it is certainly permissible to do so in civil cases. If the court may quote these books to the jury, it must follow that they should be admissible in evidence. Thus the medical opinions to prove damages can hereafter be largely taken from the pages of books, rather than from the mouths of expert witnesses. The reasons why this should not be allowed are: because such books are but hearsay evidence of matters about which living witnesses could be called to testify; because the books are written without the sanction of an oath, and the authors are not liable to cross examination; because it is difficult to determine which books are and which are not of good and established authority; because the language employed is oftentimes technical and hence not within the understanding of men of common experience, and because of the unsettled condition of the science itself. See 32 C.J.S., supra, and 65 A.L.R. 1104.

Following *Commonwealth v. Jodlowsky,* supra, the trial court should have restricted the jury's considera-

tion to the medical testimony, regardless of how "meagre and incomplete" it may have been.

The only medical testimony in the instant case was that the normal nine month period is theoretical and "can be two weeks earlier or two weeks later than the expected date."

We pointed out in the *Ranjo* case that our quoting from medical authorities does not mean that we accept as the truth everything so quoted. Conclusions written into books and articles by the medical authorities cannot be considered as fact, if for no other reason, because they are not consistent with each other. It does not follow that because medical authorities are quoted in an opinion by an appellate court, that all such authorities may be quoted to the jury.[11]

Look at the result of the majority opinion. In the *Ranjo* case the lower court quoted from Wharton & Stille's, supra, that "pregnancy may be protracted for 334 days after coitus." In the instant case the lower court quoted from DeLee-Greenhill that "pregnancy has been found to vary from 220 to 330 days." In the *Young* case Judge HIRT said "the period of gestation may last only 240 days to 300 days or longer." Herzog and vonWinckel refer to a case of 321 days after coitus

---

[11] It may be argued that if appellate court judges may examine medical authorities and quote them in opinions, the trial judges should be permitted to quote from these same authorities in their charges to the jury. It may be that we should not quote from medical authorities either. It may be that appellate courts, sometime thoughtlessly or perhaps sometimes arrogantly, assume prerogatives to themselves which they deny to the lower courts. But it seems to me that the use of quotations from learned treatises in an opinion—lower court or appellate—does not involve the dangers involved in quoting from them to a jury.

Under any circumstances I think it should be made clear that our quoting from medical authorities does not mean we necessarily accept as fact what the medical authorities say.

and another of 336 days after menses—presumably as the longest protracted pregnancies.[12] There is a great variation in the statements of medical authorities. Is each trial judge to be permitted to choose his "authority," and read it to the jury?

It is my opinion that the *Jodlowsky* case is good law, and should not be reversed. The majority opinion does reverse it.

Furthermore, I think the jury should be given some idea of the probability of a pregnancy extending for a period of 312 days. If there are only a handful of such cases in all medical history the jury should have some indication of that fact through qualified medical witnesses.

A lower court of this Commonwealth (Lancaster County) sustained a conviction on a charge of bastardy when the period of gestation would have had to be 313 days. The court there said: ". . . we are induced to believe that protracted gestation for the period of 313 days, although unusual and improbable, is not impossible. The evidence to establish the existence of such a considerable departure from the usual period, should be clear and free from doubt. The witness should possess a character beyond reproach, and her testimony should be consistent and uncontradicted in all material facts. If the jury are satisfied that the evidence for the Commonwealth is of this character, the unusually long period of gestation does not require them to disregard it." *Commonwealth v. Hoover*, 3 Clarke 195, 197 (1846).

The incontrovertible facts in the instant case raise a doubt which it seems to me could properly be deemed too clear to submit to a jury. On the other hand I recognize that no child should be denied support from

---

[12] See *Commonwealth v. Young*, supra, in which reference is made to all the medical authorities mentioned in this paragraph.

his father merely because he happened to be one in a million who was born too late.

I would grant a new trial.

I am convinced that it is reversible error to depart from the medical testimony and to quote from medical authorities not referred to in the evidence.

I would require competent medical testimony concerning the possible and probable length of pregnancy in this and all other cases where the pregnancy apparently extended beyond 300 days.

I would suggest the advisability of introducing into evidence all available information concerning the weight, length and condition of the child at birth and the condition of the mother during pregnancy which might throw light upon the probable length of pregnancy.

In this and all other cases where the pregnancy apparently extended beyond 300 days, I would require the trial judge to charge the jury, substantially in the language of *Commonwealth v. Hoover,* supra, that "a period of gestation in excess of 300 days is unusual and improbable, and that the evidence to establish the existence of such a considerable period should be clear and free from doubt, that the witness should possess a character beyond reproach, and her testimony should be consistent and uncontradicted in all material facts."

I would warn the trial courts to note the difference in the quantum of proof required to raise a reasonable doubt and the quantum of proof required to rebut the presumption of legitimacy of a child born during wedlock.

There could thus be established a logical procedure to try these cases which would avoid the confusion and injustice which, I think, will flow from the majority opinion.

WRIGHT, J., joins in this dissent.

CONCURRING OPINION BY RHODES, P. J.:

The majority opinion properly sustains the conviction of the defendant.

The dissenting opinion ignores the fact that the guilt or innocence of the defendant in this case turned on the credibility of the prosecutrix which was solely a matter for the jury.

Prosecutrix testified that she had relations with the defendant at least three times during the month of September, 1953,[1] and, further, that she had no relations with any other individual. Defendant admitted having relations with the prosecutrix as late as September 21st. He also testified that he saw the prosecutrix about the first or second of October. The testimony in this case, if believed, establishes the guilt of the defendant beyond a reasonable doubt. Credibility was solely for the jury. A reversal in this case, after the stamp of credibility has been attached to the prosecutrix' testimony by the jury, would result in this Court's taking unto itself the functions of the jury.

In *Com. v. Young,* 163 Pa. Superior Ct. 279, 283, 60 A. 2d 831, 833, quoting from DeLee-Greenhill, Principles and Practice of Obstetrics, Eighth Edition (1943), in an opinion by Judge HIRT, we said: " '. . . pregnancy has been found to vary from two hundred and twenty to three hundred and thirty days, the average being two hundred and seventy days.' " Obviously, the possibility existed that the defendant in the present case was the father of the child. The length of time a pregnancy is extended beyond the average time for pregnancies may be a relevant matter for the jury to consider in its determination of credi-

---

[1] Prosecutrix also testified, on cross-examination:

"Q. You are certain you had no relations at all with Warren after September? A. I'm not certain. I mean the only way I can tell is by these letters and by that I think so."

bility. But, while the length of time involved may decrease the probabilities of a defendant's being the father, it does not affect the possibility of his being the father. The matter here is one entirely for the consideration of the jury.

The instant case is distinguishable from *Com. v. Young*, supra, 163 Pa. Superior Ct. 279, 60 A. 2d 831, and *Com. v. Jodlowsky*, 163 Pa. Superior Ct. 284, 60 A. 2d 836. In those cases the prosecutrix admitted having relations with someone other than the defendant during the period involved. As was correctly said in *Com. v. Young*, supra, 163 Pa. Superior Ct. 279, 283, 60 A. 2d 831, 833: "But a prosecutrix may not be permitted to select one of two men as responsible if both of them had intercourse with her about the time that conception may have occurred." In the instant case, however, prosecutrix specifically denied having relations with anyone other than defendant during the time conception may have occurred, and her character is not otherwise questioned.

Defendant claims that the trial judge erred in his charge to the jury when he stated, in effect, that the period of gestation may vary from two hundred twenty to three hundred thirty days. This is a fact of which a court may take judicial notice. However, it should be noted that the court below merely repeated verbatim what we said in *Com. v. Young*, supra, 163 Pa. Superior Ct. 279, 60 A. 2d 831. In my opinion, it was not error for the trial judge to quote from an applicable decision of this Court, but, even if it were, it was not prejudicial error requiring a reversal in this case.