647 S.W.2d 74 (1983)
In re E.G.M., a Child.
No. 04-81-00257-CV.
Court of Appeals of Texas, San Antonio.
February 2, 1983.
*75 L. Sue Funk, San Antonio, for appellant.
Lee Alvarado, Jr., San Antonio, for appellee.
Before ESQUIVEL, CANTU and REEVES, JJ.

OPINION
CANTU, Justice.
This is a paternity suit brought by the Texas Department of Human Resources on behalf of R_____ M_____ and tried on February 21, 1980. The petition alleged that G_____ M_____ was the biological father of the child E_____ G_____ M_____, and sought to secure appropriate child support orders concerning the child. Trial was had to the court without a jury. The procedures involved in this and any suit to establish paternity are specifically set out in the Tex.Fam.Code Ann. §§ 13.01-13.09 (Vernon Supp.1982-1983).
Pursuant to court order the mother, alleged father, and the child submitted to blood tests administered by court appointed medical experts Drs. Michael Stroud and D. Leo Galindo. A paternity testing report was provided the trial court and the parties agreed to waive the pretrial conference provided for by § 13.04. A stipulation was entered into by the parties that the blood test results failed to show by clear and convincing evidence that appellee was not the father of the child. A trial on the merits was requested and following a brief hearing a finding of non-paternity was entered by the trial court.
Appellant's sole point of error challenges the trial court's finding that the appellee is not the biological father of the child, arguing that the finding is against the great weight and preponderance of the evidence. Appellant places exclusive reliance upon the case of G_____ v. G_____, 604 S.W.2d 521 (Tex.Civ.App.Dallas 1980, no writ) for reversal.
While appellant's point of error, as phrased, has given other court's license to limit review to only that evidence which is favorable to the trial court's finding because the contention fails to allege that the finding is so against such a preponderance of the evidence as to be manifestly unjust or clearly wrong; Poynor v. Varner, 266 S.W.2d 462 (Tex.Civ.App.Eastland 1954, no writ); Vaughn v. Vaughn, 279 S.W.2d 427 (Tex.Civ.App.Texarkana 1955, writ ref'd n.r.e. in accord with Poynor v. Varner but nevertheless reviewing entire record) we have examined appellant's argument and authorities and conclude that a factual sufficiency challenge was intended under the "against the preponderance of the evidence as to be manifestly unjust or clearly wrong" test. Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478 (1943). Accordingly under our fact finding jurisdiction we review the entire record. Traylor v. Goulding, 497 S.W.2d 944 (Tex.1973); Choate v. San Antonio & A & P Railway Co., 91 Tex. 406, 44 S.W. 69 (1898).
On direct examination, R_____ M_____, mother of the child, 22 years old at the time of trial, testified that she met appellee, who was 18 years old at the time of trial, during the latter part of October, 1978, at a wedding. She testified that they began dating within a week. About a month after their initial meeting, she testified, the parties initiated sexual activity and the parties thereafter had intercourse at least once a week or whenever appellee came by her house. Sexual activity between the parties continued until late in the month of December, 1978. R_____ M_____ contended that during the months of October, November and December of 1978, appellant was the only person with whom she had sexual intercourse. During direct examination appellant also claimed to have had intercourse with appellee in September, 1978, fully one *76 month before she met him, according to her own testimony.
R_____ M_____ believed that she became pregnant about November 28, 1978, after confirming her pregnancy about the middle of December. The child was born September 4, 1979, one day before her doctor told her to expect it.
On cross-examination, R_____ M_____ admitted that she had been keeping a diary containing the names of all the men she had engaged in sexual intercourse with and the date on which each act occurred. She explained that she discarded the diary on December 28, 1978, because she "... didn't need itdidn't want to keep it anymore."
R_____ M_____ specifically recalled having sexual intercourse with appellee on the 5th, 12th and the 22nd days of December, 1978. Although she claimed to have seen appellee on December 31, 1978, she did not purport to have engaged in sexual activity with appellee after December 22, 1978.
R_____ M_____ admitted knowing someone identified as "Armando" and did not deny engaging in sexual intercourse with him. However, she claimed not to have seen him since May of 1978.
She adamantly denied engaging in sexual intercourse with anyone between the period of time from May through November 1978. This is in direct conflict with her testimony that she engaged in sexual intercourse with appellee in September and October as well as in November and December.
Belinda Litzler, testifying on behalf of appellant stated that she had double dated with R_____ M_____ and appellee during the beginning of her senior year in high school. Because of the warm weather, she believed the date occurred in September or possibly October of 1978. She specifically remembered going to a Pigstand Drive-in restaurant and R_____ M_____ becoming ill and going to the restroom to vomit. Two weeks later, Litzler recalled R_____ M_____ informed her that she was already over two months pregnant.[1]
Appellant called R_____ M_____'s brother Ramon who testified that he remembered seeing appellee at his sister's house twice during the month of December, 1978. On cross-examination Ramon admitted that his recollection as to the dates had been refreshed by conversations with R_____ M_____ before the trial. He also admitted calculating the time frame based upon the nine month period in a normal pregnancy.
Appellant's final witness was Dr. Michael Stroud, a pathologist engaged in performing paternity testing. Dr. Stroud testified that he had been appointed by court order to perform blood tests on R_____ M_____, appellee, and the child to determine possible paternity. He described four blood grouping tests performed and concluded that the tests did not exclude appellee as being the father of the child in question. He further expressed the opinion that appellee was possibly the father of the child, that genetically it is possible for appellee to be the biological father and that the chances were 90.2 to 1 that appellee was the father of the child.
During cross-examination Dr. Stroud admitted that under the first test approximately 90.3 percent of all Mexican Americans in the United States could have the same genetic makeup capable of supporting a finding of being the father.
The second test revealed that all three of the parties tested belonged to blood group N. According to Dr. Stroud 43% of the Mexican American population carry that particular characteristic. When asked about the third and fourth tests Dr. Stroud admitted that it is possible that another man could have a chromosome setup identical to appellee's and that it is virtually impossible to prove conclusively that any one particular man is the father of a given child.
In response to examination by the trial court Dr. Stroud admitted that under the fourth test, HLA typing, if there is no exclusion of paternity the likelihood of paternity *77 was usually greater than 90%. Dr. Stroud explained that his final figure of 98.9 percent likelihood of paternity was based upon computation involving the figures obtained from all four tests.
Appellee testified that he was 15 years old when he met R_____ M_____ while visiting one of his friends who was sharing a house with R_____ M_____ and another female. Appellee admitted having intercourse with R_____ M_____ on three or four occasions but could not remember the dates. He, however, speculated that they did not occur in December 1978[2] because he had just met R_____ M_____ either in November or December and he was sure he had not stayed with R_____ M_____ until sometime after he met her.[3]
Although appellee did not profess to know "Armando" he stated that R_____ M_____ kept his photograph in her bedroom and that she told him she was secretly married to Armando.
R_____ M_____ did not rebut any of appellee's testimony, however, much of it was consistent with her own testimony particularly on the material issues before the court.
The duration of pregnancy, or period of gestation, is the interval in days between the time of impregnation and the beginning of labor. The normal period of gestation, according to the consensus of medical authority, is approximately 9 calendar months, 10 lunar months, or 280 days, calculated from cessation of the last menstruation. Taylor's Med.Jur. ii, 45, 46; Schatkin, Disputed Paternity Proceedings, 4th ed. (1980).[4]
According to R_____ M_____ conception occurred about November 28, 1978. A normal period of gestation calculated from the date of the child's birth would place the date of conception at about November 29, 1978. There is no evidence that the child was not a full term infant. To the contrary, the child weighed eight pounds, five ounces at birth and was, according to R_____ M_____, born one day before expected.
If the period of time suggested by the witness Litzler is accepted as true R_____ M_____'s pregnancy lasted in the vicinity of 334 days to 365 days. The longest documented pregnancy in legal annals is attributed to Mrs. Lockwood in Lockwood v. Lockwood, 62 N.Y.S.2d 910 (1946) (355 day gestation period). See also Wood v. Wood, 2 ALL E.R. 95 (1947) (346 day gestation period); Hadlum v. Hadlum, 2 ALL E.R. 412 (1948) (349 day gestation period); Viles v. Woermann, 274 App.Div. 788, 81 N.Y. S.2d 196 (1948) (323 day gestation period).[5]
There is a suggestion in the record that others, besides appellee, may have had access to R_____ M_____ during the critical period in question. But this is sheer speculation unsupported by competent evidence and is in direct conflict with R_____ M_____'s adamant denial.
The evidence supports but one conclusion; that the only person known to have had sexual intercourse with R_____ M_____ within the critical period, with leeway in either direction, was appellee. While evidence *78 of sexual intercourse during a given period does not alone establish paternity it is probative on the issue of time of conception.
The remaining question in a paternity case after exclusive access is proved, is the medical probability that appellee is the father of the child. It is now recognized that blood group testing may be used to conclusively prove that a man is not the biological father of a certain illegitimate child. In the Interest of B.M.N., 570 S.W.2d 493 (Tex.Civ.App.Texarkana 1978, no writ); D.W.L. v. M.J.B.C., 601 S.W.2d 475 (Tex.Civ.App.Houston [14th Dist.] 1980, writ ref'd n.r.e.); Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981).
While paternity may be conclusively disproved, conclusive proof of paternity remains an unattainable goal. With the full knowledge of "... lurking problems with respect to proof of paternity" Gomez v. Perez, 409 U.S. 535, 98 S.Ct. 872, 35 L.Ed.2d 56 (1973), we necessarily deal in probabilities, and as such probability of paternity is not entitled to that decisive weight accorded evidence of exclusion of paternity. Even probabilities that are high do not necessarily compel a particular finding as a matter of law. Nor do we think that the results of high probability standing alone necessarily equate to a preponderance of the evidence.
A trial of paternity is essentially a trial of the complaining mother's credibility. Medical testimony merely aids to corroborate or discredit her testimony. As such, blood testing assists in the truth finding process but does not compel a decision in a non-exclusion case. The role of the fact finder is preserved and findings will not be disturbed by the reviewing court merely because the findings are against the preponderance of the evidence, if they are supported by some evidence of probative force. Harris v. Rabe, 375 S.W.2d 919 (Tex.Civ. App.Waco 1964, no writ).
But where the findings are against the preponderance of the evidence as to be manifestly unjust or clearly wrong or are unsupported except by conjecture or surmise we should not hesitate to set them aside. Donnell v. Acker, 343 S.W.2d 718 (Tex.Civ.App.Houston 1961, no writ); Central Surety & Insurance Corp. v. Hankins, 140 S.W.2d 360 (Tex.Civ.App.San Antonio 1940, no writ).
In light of the evidence developed at the trial and guided by the foregoing principles we must agree with appellant that the findings of the trial court are against the weight and preponderance of the evidence as to be manifestly unjust or clearly wrong.
We recognize that the trial court was presented with much evidence containing contradictions, inconsistencies and evasive answers. No doubt in the mind of the trial court these deficiencies seriously eroded the mother's credibility, and justifiably so. Notably appellee, in his brief, argues exclusively about the lack of credibility of appellant's witnesses without once mentioning his testimony. Understandably, the burden of proof has never been upon him, nevertheless, his position has never encompassed any defense other than "I don't remember," "I don't know" and "R_____ M_____ is not worthy of belief."
The fact remains that on the matters that constituted the controlling issues in the case, almost no dispute arose among the parties. In effect there was little, if any, dispute on the question of exclusive access during the relevant period. When taken together with the medical testimony indicating a 98.9% likelihood of paternity, we think the trial court's finding of non paternity is against the great weight and preponderance of the evidence and that it is manifestly unjust and clearly wrong. We decline to hold, as did the court in G_____ v. G_____, supra, that a certain percentage of likelihood of paternity necessarily equates to the same percentage of probability that R_____ M_____ was telling the truth.[6] To do so, we think, deprives the fact finder *79 of its role as judge of the credibility of witnesses. We do think, however, that evidence of a high probability of paternity can amount to strong corroboration of a witness' story on the material issues and when taken together with proper undisputed facts can preponderate in favor of a finding of paternity. This is such a case.
Reversed and remanded.
NOTES
[1] Such a pregnancy would have been of 11 or 12 months during if believed.
[2] Appellee also testified that he might have spent the night with R_____ M_____ in December 1978, that he met her during the latter part of 1978 either in November or December and that he could not say whether or not he had intercourse with her in November.
[3] There is no evidence what period of time appellee meant by "sometime after he met her."
[4] When there is no expert testimony adduced as the time of the last menses, courts have troubled over a reliable method of calculating the term of gestation. See Leonard v. Cousa, 83 Misc.2d 631, 372 N.Y.S.2d 527 (1975); Commonwealth v. Watts, 179 Pa.Super. 398, 116 A.2d 844 (1955). In the case before us, however, there was no evidence showing anything but a full term pregnancy.
[5] No disrespect is meant to the memory of the Countess of Gloucester, whose child, born 1 year and 7 months after her husband's death, was determined the legitimate heir of her dead husband by the English Courts. Nor to Mr. Baron Rolfe who pronounced "with apparent gravity" that a widow might give birth to a legitimate child 7 years after her husband's death. See 7 A.L.R. 331, Bastardy, Presumptions of Validity, (1920).
[6] In the instant case we doubt that R_____ M_____'s entire testimony could approach a 98.9% rating on a truth scale. However, when limited to the material issues a higher correlation is evident.