675 S.W.2d 323 (1984)
C.G.W., Appellant,
v.
B.F.W., Appellee.
No. 04-83-00116-CV.
Court of Appeals of Texas, San Antonio.
July 25, 1984.
*324 Patrick H. Dooley, Patrick M. Dooley, Dooley & Hoerster, Fredericksburg, for appellant.
James P. Kraus, Wieser & Kraus, Fredericksburg, for appellee.
Before ESQUIVEL, BUTTS and DIAL, JJ.

OPINION
DIAL, Justice.
This is an appeal from a divorce decree finding that appellee's child is a child of the marriage of appellant and appellee and ordering appellant to pay child support. Appellant denies he fathered the child. We reverse and render judgment for appellant.
Appellant raises four points of error. Points three and four present equal protection and due process objections to the difference in treatment of putative fathers based on marital status accorded by the version of Chapters 12 and 13 of the Texas Family Code in effect at the time of this suit, initiated June 1981.[1] Specifically, appellant complains that, while Chapter 13 provided for procedures using blood test evidence when an unmarried male denied paternity, Chapter 12 lacked such a provision for a married male trying to rebut the presumption of legitimacy. TEX.FAM. CODE ANN. § 12.02(a) (Vernon Supp. 1984). We do not reach constitutional questions because one of appellant's two evidentiary points disposes of this case. The dispositive point states the blood test evidence at trial proved as a matter of law appellant is not the child's father.[2]
*325 Heretofore, Texas cases involving the denial of paternity (Chapter 12 cases) have focused on the presumption of legitimacy. TEX.FAM.CODE ANN. § 12.02(a) states the presumption: "A child is the legitimate child of his father if the child is born or conceived before or during the marriage of his father and mother." The court in Joplin v. Meadows, 623 S.W.2d 442, 443 (Tex.App.Texarkana 1981, no writ), described this presumption as "one of the strongest known to our law and it can be rebutted only by clear and convincing evidence showing the impossibility that the child was sired by the presumed father." The testimony or other evidence relied upon to prove the illegitimacy of a child conceived or born during marriage must clearly establish either nonaccess or impotency. Id. at 444; Wedgman v. Wedgman, 541 S.W.2d 522, 523 (Tex.Civ.App.Waco 1976, writ dism'd). The court in Barcelo v. Barcelo, 603 S.W.2d 276, 277 (Tex.Civ.App. Houston [14th Dist.] 1980, writ dism'd) suggested that, although the evidence was not sufficient in its case, "where a successful vasectomy has been proved by clear and convincing evidence the presumption of legitimacy will be rebutted."
No Texas case involving the denial of presumed paternity has addressed the admissibility and weight of blood test evidence. However, statutes have provided for blood tests in paternity suits since 1975. TEX.FAM.CODE ANN. §§ 13.02-.06 (Vernon Supp.1984) direct courts to order blood tests and specify how the evidence is to be considered. For example, section 13.05(a) prescribes that if, at the conclusion of a pretrial conference held to consider blood test evidence, the court finds that the tests show by clear and convincing evidence that the alleged father is not the father of the child, the court shall dismiss the paternity suit with prejudice. At the time of the present suit, no statute comparable to sections 13.02-.06 existed for suits involving the denial of presumed paternity, although such a statute, TEX.FAM.CODE ANN. § 12.06(b), has now been added. Before the addition of section 12.06, two courts held sections 13.01-.06 were inapplicable in suits to establish nonpaternity. Magana v. Magana, 576 S.W.2d 131, 134 (Tex.Civ. App.Corpus Christi 1978, no writ)); Clark v. Clark, 643 S.W.2d 795, 797 (Tex.App. Fort Worth 1982, no writ). In addition, the Clark court considered whether the trial court's refusal of a blood test order under TEX.R.CIV.P. 167a was an abuse of discretion.[3] *326 Rule 167a allows court ordered physical or mental examination of a party if physical or mental condition is in controversy. Clark held the trial court did not abuse its discretion in refusing to order tests because:
[I]n [the judge's] opinion, it was clear that the appellant/husband was the father of the child. There is no stronger presumption in the law than the one which says that a child born in lawful wedlock is presumed to be legitimate. Only a finding on nonaccess (or impotence) would overcome the presumption that the child was the legitimate issue of the lawful marriage during which it was conceived and born.
Id. at 797.
The case before us, unlike Magana and Clark, does not involve trial court refusal of a blood test order. Here, the parties voluntarily submitted to blood tests. Nevertheless, at trial, appellee's attorney objected to the admission of the blood test records, giving two reasons. First, the agreed court order had only specified testing of the mother, child, and presumed father, but the laboratory had tested appellant's parents as well. Second, since only evidence of impotency or nonaccess was admissible, blood test evidence was inadmissible. Appellee's attorney made no objection as to the reliability of the testing procedure or results. The trial court overruled appellee's objections and admitted the testimony and records of the doctor who performed and interpreted the tests. At the conclusion of the trial without a jury, however, the court made findings of fact and conclusions of law which do not mention the blood tests.
The trial judge found that the child was conceived and born during the marriage and that appellant had had access to and intercourse with appellee during the time of probable conception. The judge concluded that evidence of sterility existing subsequent to the conception and birth of the child was not sufficient to conclusively establish the fact of biological impossibility and rebut the presumption of legitimacy.[4] The judge further concluded that the child was a child of the marriage of appellant and appellee.
Two possible explanations exist for the trial court judgment and the omission of any mention of the blood tests in the court's findings. The court may have decided that the test evidence was inadmissible after all, perhaps because it related to neither of the time-honored exceptions of nonaccess or impotency. On the other hand, the court could have impliedly found the blood test evidence, either alone or together with evidence of sterility, was not sufficient to be clear and convincing evidence of biological impossibility. We disagree in either case. First, blood test evidence is admissible to rebut the presumption of legitimacy. Such evidence is relevant and, where properly conducted, reliable. Second, evidence of properly conducted blood grouping tests may be conclusive on the issue of biological impossibility.
The judgment here is sustainable only if the trial court in looking at the evidence could conclude appellant failed to rebut the presumption of legitimacy, i.e., failed to prove biological impossibility or nonpaternity. TEX.R.CIV.P. 299. But in this case, the blood test evidence alone conclusively proves nonpaternity. Therefore, the finding and judgment based thereon that the child is a child of the marriage cannot stand.
First, we examine admissibility. The basic question as to blood test relevancy is whether biological fatherhood is an issue in *327 Texas nonpaternity cases. In California, statutory law conclusively presumes "the issue of a wife cohabitating with her husband, who is not impotent or sterile" to be "a child of the marriage." CAL.EVID. CODE § 621(a). California courts have held that section 621(a) is a rule of substantive law. Kusior v. Silver, 54 Cal.2d 603, 619, 7 Cal.Rptr. 129, 140, 354 P.2d 657, 668 (1960) (treating an earlier statute, Code of Civil Procedure § 1962 subd. 5, which was nearly identical to § 621(a)). "The husband is deemed responsible for his wife's child if it is conceived while they are cohabitating; he is the legal father and the issue of biological paternity is irrelevant." Keaton v. Keaton, 7 Cal.App.3d 214, 216, 86 Cal. Rptr. 562, 563 (Dist.Ct.App.1970).[5]
In Texas, on the other hand, the legislature and the courts have indicated that biological fatherhood is determinative. The legitimacy presumption statute, TEX. FAM.CODE ANN. § 12.02(a), in using the term "father" clearly refers to the biological male parent.[6] Case law indicates that nonaccess and impotency are exceptions to the legitimacy presumption because they negate biological fatherhood, namely, they show "the impossibility that the child was sired by the presumed father." See Joplin v. Meadows, supra, at 443.
In addition to being relevant to the central issue in nonpaternity cases, blood tests, when properly conducted and reported, are reliable and, in fact, generally superior to other sources of information as to *328 biological fatherhood.[7] In Little v. Streater, 452 U.S. 1, 101 S.Ct. 2202, 68 L.Ed.2d 627, 633-34 (1981), the Supreme Court dealt with a state statute which required that blood test costs in a paternity suit be chargeable against the party requesting the tests. The Court held that application of the statute denied an indigent putative father due process in a paternity suit brought against him by the mother aided by a state agency. The Court noted that blood tests, if administered by experts, can conclusively disprove paternity in a great many cases. Furthermore, the importance of scientific evidence was heightened in paternity suits because of the usual lack of eyewitnesses and often self-serving testimony of parties. A report developed jointly by the American Bar Association and the American Medical Association attests to the ability of blood grouping tests to exclude paternity. Miale, Jennings, Rettberg, Sell & Krause, Joint AMA-ABA Guidelines: Present Status of Serological Testing in Problems of Disputed Parentage, 10 Fam.L.Q. 247 (Fall 1976).
The Texas legislature has indicated its approval of blood test evidence by making such evidence conclusive in pretrial proceedings in paternity suits if "the tests show by clear and convincing evidence that the alleged father is not the father of the child...." TEX.FAM.CODE ANN. § 13.05(a) (Vernon Supp.1984). The court in In the Interest of B___ M___ N___, a Child, 570 S.W.2d 493, 502 (Tex.Civ.App.Texarkana 1978, no writ) held that § 13.05(a)'s limitation of proof to scientific evidence rather than circumstantial evidence is rationally based because "the legislature has determined that blood tests are the most accurate methods to determine the lack of paternity...." The legislature has again shown its approval of blood test evidence in adding TEX.FAM.CODE ANN. § 12.06(b), effective September 1, 1983, which extends Chapter 13's pretrial proceedings and blood test orders to Chapter 12 suits involving the denial of paternity. In paternity suits, Texas courts have recognized that "blood group testing may be used to conclusively prove that a man is not the biological father of a certain illegitimate child." In re E.G.M., 647 S.W.2d 74, 78 (Tex.App.San Antonio 1983, no writ). We hold evidence of properly conducted blood tests is admissible in suits denying paternity brought under Chapter 12 of the Texas Family Code.
Second, we consider the weight to be given blood test evidence.[8] Arizona courts *329 first handled blood test evidence in a suit denying paternity in Anonymous v. Anonymous, 10 Ariz.App. 496, 460 P.2d 32 (1969). The court viewed the case as a "classic confrontation of advancing medical technology versus judicial presumptions [in this case, the presumption of legitimacy]...." Id. at 33. The father was not excluded by ABO or MN blood grouping but was excluded by Rh typing. The court stated that evidence of properly conducted blood grouping tests which excludes the husband as the father of his wife's child is not only clear and convincing, but is conclusive. "To hold otherwise would be tantamount to this court, by judicial decree, declaring the laws of motion and gravity to be repealed." Id. at 35.
However, the argument may be made that Texas policy reasons behind the legitimacy presumption preclude blood test evidence from being given conclusive weight. Certainly, the Texas Family Code treats nonpaternity (Chapter 12) and paternity (Chapter 13) suits differently. The burden of proof in a Chapter 13 suit is on the party trying to prove paternity. But the burden of proof in a Chapter 12 suit is on the party trying to deny paternity. The very section which added blood test procedures for Chapter 12 suits after September 1, 1983, section 12.06, includes a subsection (c) reaffirming that "the man who is denying his paternity of the child has the burden of establishing that the man is not the father of the child." In addition, the party denying paternity must rebut the presumption of legitimacy and, then too, not by a mere preponderance of evidence, but by clear and convincing evidence. Obviously, policy favors suits establishing paternity and disfavors those disporting paternity. See, e.g., Home of the Holy Infancy v. Kaska, 397 S.W.2d 208, 213 (Tex.1965); Ethison v. Greathouse, 596 S.W.2d 233, 236 (Tex. Civ.App.Houston [1st Dist.] 1980, no writ).
But as long as biological fatherhood is the issue in Chapter 12 suits involving the denial of paternity, there is no sound reason for not giving full weight to reliable blood test evidence which conclusively excludes biological fatherhood. When the supreme court rejected the Lord Mansfield rule in Davis v. Davis, 521 S.W.2d 603, 608 (Tex.1975), it was confronted with a rule that attempted to protect values similar to those undergirding strict limitations on exceptions to the legitimacy presumption. See, e.g., United States Fidelity & Guaranty Co. v. Henderson, 53 S.W.2d 811, 813 (Tex.Civ.App.Amarillo 1932, no writ) (policy behind Lord Mansfield rule). The supreme court, however, found no justification for a rule which simply made proof of illegitimacy more difficult but did not entirely exclude such evidence. Moreover, the court regarded with disfavor "blindfolds on triers of fact." Id. At present, evidence on nonaccess and impotency is permissible to prove biological impossibility. Excluding or arbitrarily lessening the weight of reliable blood test evidence simply *330 makes proof of biological impossibility more difficulty, not irrelevant. Of course, without blood test evidence, more children would retain the status of legitimacy, but the integrity of the judicial truth finding process would be sacrificed.[9] We hold that evidence of properly conducted blood tests which is scientifically conclusive as to paternity exclusion is likewise legally conclusive as to nonpaternity.
Finally, we turn to the blood test evidence in this case. At trial, Dr. Michael B. Stroud, a pathologist, testified about blood testing of the parties, the child, and appellant's parents. Measures were taken to insure test security, e.g., fingerprinting, Polaroid photographs, and driver's license identification of subjects. Duplicate testing and controls to check chemical agents and test results were used to insure scientific reliability. Dr. Stroud's initial red blood cell testing uncovered one exclusion of paternity in the MN Blood Group System. The child is an NN. Stroud's final report states appellant cannot be the father because he does not carry the gene for the N antigen. Another group of tests, red blood cell enzyme and serum haptoglobin tests, were performed by another lab, but the results did not exclude paternity. Stroud's HLA typing revealed that the child had received a chromosome carrying genes A2 and B12 from her father. Appellant has genes A2 and B12 in his body, but Dr. Stroud could not determine which chromosomes carried these genes without testing appellant's parents. Dr. Stroud wrote the court saying the initial testing results were inconclusive and suggesting that further information might be obtained by blood typing appellant's parents and siblings.
Subsequently, appellant's parents were tested. The results showed that appellant's A2 and B15 genes were on the same chromosome while his A3 and B12 genes were on another chromosome. Dr. Stroud concluded that appellant cannot be the father of the child because the genes he carries for A2 and B12 are located on different chromosomes. Any children produced by appellant would be expected to receive either a chromosome bearing genes for A3 and B12 or a chromosome bearing genes A2 and B15. But the child in this case must have received from its father a chromosome bearing the genes A2 and B12. Dr. Stroud stated that he could not be 100% certain that the chromosomes in appellant's parents did not cross over, but that the chance of such a crossover was less than one percent. Dr. Stroud concluded that the HLA system yielded two exclusions. Dr. Stroud defined an "exclusion of paternity" as meaning "that it is genetically impossible for an alleged father to be the true biological father." Dr. Stroud asserted that laboratory tests can prove conclusively that a man is not the father of a child, and that appellant cannot be the father of the child here based on the two HLA exclusions and the one MN Blood Group exclusion.
The evidence here affirmatively shows careful blood testing procedures insuring security and scientific accuracy. Appellee does not, either at trial or on appeal, raise any objections as to the reliability of Dr. Stroud's test procedures or results.[10] The *331 tests are scientifically conclusive as to paternity exclusion. Thus we hold that the blood test evidence in this case is legally conclusive as to nonpaternity.
The judgment is reversed and rendered for appellant.
ESQUIVEL, Justice, dissenting.
As the majority correctly points out, at the time the case before us was tried, the long established case law in this state provided that a child born or conceived in wedlock is presumed to be the legitimate child of the mother and her then husband, Caddel v. Caddel, 486 S.W.2d 141, 145-46 (Tex.Civ.App.Amarillo 1972, no writ); that the presumption is one of the strongest known to the law and could only be overcome by clear and convincing evidence of either non-access or impotency, Davis v. Davis, 521 S.W.2d 603, 607 (Tex.1975); Clark v. Clark, 643 S.W.2d 795, 797 (Tex. App.Fort Worth 1982, no writ); Magana v. Magana, 576 S.W.2d 131, 133 (Tex.Civ. App.Corpus Christi 1978, no writ); Young v. Young, 545 S.W.2d 551, 553 (Tex. Civ.App.Houston [1st Dist.] 1977, writ dism'd); Wedgman v. Wedgman, 541 S.W.2d 522, 523 (Tex.Civ.App.Waco 1976, writ dism'd); Zimmerman v. Zimmerman, 488 S.W.2d 184, 185 (Tex.Civ.App.Houston [14th Dist.] 1972, no writ); Esparza v. Esparza, 382 S.W.2d 162, 168 (Tex.Civ. App.Corpus Christi 1964, no writ); Burtis v. Weiser, 195 S.W.2d 841, 842 (Tex.Civ. App.Beaumont 1946, writ ref'd); and, that blood test evidence was inadmissible to overcome the presumption. Clark, 643 S.W.2d at 797; Magana, 576 S.W.2d at 134.
I am of the opinion that this court should follow the long established line of cases. The fact that the legislature has since changed the law is no reason for this court, in the absence of a directive from the legislature to the contrary, to abandon its function of reviewing a case based on the law in effect at the time.
Accordingly, I respectfully dissent.
NOTES
[1] In 1983, the legislature added TEX.FAM.CODE ANN. § 12.06 (Vernon Supp.1984), effective September 1, 1983. Section 12.06(b) provides that, "In any suit in which a question of paternity is raised under this section, the court shall conduct the pretrial proceedings and order the blood tests as required in a suit under Chapter 13 of this code."
[2] Appellant's other evidentiary point asserts that the trial court's finding the child is a child of the marriage is against the great weight of the evidence and is against the clear and convincing evidence rebutting the presumption of legitimacy. The record contains the following evidence. Appellant had access to and intercourse with appellee during the probable time of conception. The child was conceived and born during the time of the marriage. On the other hand, even setting aside the blood test evidence, appellant has strong scientific evidence of nonpaternity. Two doctors testified as to appellant's sterility.

Dr. Wilbur Crenwelge, a pediatrician, testified he had examined appellant when the latter was fifteen. Appellant had a congenital disorder, undescended testicles. Crenwelge said that in the usual set of circumstances a person with this condition is incapable of producing sperm. Crenwelge expressed the opinion that appellant could not have fathered a child in 1980, but, on cross-examination, said he could not be one hundred percent certain that there might not have been a production of sperm. Crenwelge had a semen specimen obtained from appellant in July 1981, examined with the result that no sperm, either dead or alive, were found. Crenwelge recommended that appellant see Dr. George Decherd, a specialist in urology.
Dr. Decherd likewise examined a semen specimen obtained from appellant and found no sperm. Decherd testified appellant had undescended testicles. Decherd stated that the condition is congenital and if allowed to persist after puberty results in sterility or the lack of production of sperm. By the time the male reaches puberty and hormonal changes have taken place, the condition is irrevocable and it is a certain fact that the individual is sterile. Decherd testified that, "It is accepted as medical fact that males who have undescended testes after puberty do not produce sperm, and are incapable of fatherhood," and that to his knowledge, there is no exception. Decherd stated that appellant could not have fathered a child.
Appellee, though making no objection at trial as to the security of the seminal specimens, argues in her appellate brief that the doctors did not testify as to conditions of seminal specimen collection which would insure that the specimen belonged to appellant. The trial judge's finding on the sterility issue stresses the timing of the seminal specimen collection. The judge found that "evidence of sterility existing subsequent to the conception and birth of the child is not sufficient to conclusively establish the fact of biological impossibility and rebut the presumption of legitimacy." (Emphasis added). The judge cites Annot., 84 A.L.R.3d 495, 498-504 & 518-25 (1978). The pages cited chiefly discuss semen specimen collection procedures which cast doubt on the integrity of the examination results and the difficulty of establishing sterility at the time of conception from semen specimens produced after the time of conception.
We do not decide whether the strong evidence of sterility is sufficient to rebut the legitimacy presumption. Since we hold that the blood tests conclusively show nonpaternity, we need not address appellant's great weight point.
[3] Professor Smith had suggested TEX.R.CIV.P. 167a as a way for a party to secure blood tests in a suit involving the denial of paternity. Smith, Texas Family Code Symposium; Chapter 12, The Parent-Child Relationship, 13 TEX. TECH.L.REV. 887, 890 (1982).
[4] Appellant need not have conclusively established biological impossibility. The standard is clear and convincing evidence of impossibility. Joplin v. Meadows, supra, at 443.
[5] California law has made adjustments in order to maintain its conclusive presumption of legitimacy. In 1980 and 1981, the California legislature added subdivisions (b) through (g) to section 621, allowing the mother or the husband, within two years of the child's birth, to present blood test evidence disputing the presumed paternity. In the most recent California case dealing with the presumption, Estate of Cornelious, 35 Cal.3d 461, 198 Cal.Rptr. 543, 674 P.2d 245, 248 (1984), the California Supreme Court suggested that these subdivisions were added to section 621 in response to a rationale like that described in Recent DevelopmentsCalifornia's Tangled Web: Blood Tests and the Conclusive Presumption of Legitimacy, 20 Stan.L.Rev. 754, 761-65 (1968). The presumption is maintained intact to preserve the social relationship of the older child with its presumed father. But the presumption is rebuttable by blood test evidence during the time when the child is too young to have developed a strong social relationship.

California's presumption aims at promoting social policies: "preservation of the integrity of the family, protection of the welfare of children by avoiding the stigma of illegitimacy and keeping them off welfare rolls, and insurance of the stability of titles and inheritance." Estate of Cornelious, 674 P.2d at 247. But the presumption affects cases other than those for child support. In Estate of Cornelious, a woman claimed to be the illegitimate child of the deceased and, hence, entitled to be his heir and administratrix of his estate. The trial court conclusively presumed the woman to be the daughter of the man to whom her mother was married at the time of her conception and birth. The presumption of legitimacy prevented her from showing that it was genetically impossible for there mother's husband to be her father and, thus, from showing the deceased was her biological father. The California Supreme Court held that application of the presumption did not deny the woman due process since her interest in proving paternity of the deceased did not outweigh the state's interest in maintaining its presumption of legitimacy. The balancing test for reviewing due process challenges to the conclusive presumption was adopted by the California Court in In re Lisa R., 13 Cal.3d, 636, 119 Cal.Rptr. 475, 532 P.2d 123, cert. denied sub. nom., Porzuczek v. Towner, 421 U.S. 1014, 95 S.Ct. 2421, 44 L.Ed.2d 682 (1975). The balancing test requires a case-by-case weighing of the state's interests in maintaining the presumption against the competing private interests in rebutting it. See Estate of Cornelious, 674 P.2d at 249-53 (Bird, C.J., dissenting).
[6] Smith, Texas Family Code Symposium: Chapter 12, The Parent-Child Relationship, 13 TEX. TECH.L.REV. 887, 888-89 (1982).

Section 12.02, as originally drafted, used the word "father" instead of "man." A Texas House of Representatives committee amendment removed the original word because of its limited use and meaning in the rest of title 2 and inadvertently set forth a rule, that if literally applied, would have resulted in a stepfather's parentage of his stepchildren. Committee hearings and the analysis of the bill, however, supported a construction of the statute that would have been in keeping with previous Texas law as embodied in section 42 of the Probate Codethat is, "man" means "biological father." This interpretation was followed in Young v. Young, [545 S.W.2d 551 (Tex.Civ.App.Houston [1st Dist.] 1976, writ dism'd)]. Subsections (a) and (b) were amended in 1975 by substituting the term "father" for "man." In this context, "father" clearly refers to the biological male parent.
[7] Sampson in Texas Family Code Symposium: Chapter 13, Determination of Paternity, 13 TEX. TECH.L.REV. 897, 906-07 (1982), commented on the redundancy feature of § 13.03(a)'s original provision that the court may appoint "two or more" blood examiners, amended in 1979 to read "one or more." Sampson noted that "[a]ctually, a conflict of expert testimony has no place in [the context of blood test evaluation]. Serological blood testing is a `hard' science; all experts given the same data will reach the same conclusion. The basic principles underlying blood testing are universally recognized by all reputable scientists." Sampson, however, points out that "[a]lthough the scientific reliability of an accurately performed blood test is unquestioned, the chain of evidence and the actual testing procedure could be examined and even attacked by vigorous counsel." Id. at 909.

See also Beautyman, Paternity ActionsA Matter of Opinion or a Trial of the Blood? 4 J. Legal Med. 17, (Apr.1976). Where the probability of paternity is zero, the evidence should be accepted as conclusive in law. Policy behind the legitimacy presumption is no longer persuasive "in the face of nearly infallible blood test evidence." Id. at 18 and 23-25.
[8] States vary as to the weight to be accorded blood test evidence excluding paternity. Annot., 46 A.L.R.2d 1000-1038, §§ 10(a), (b) § 13-15 (1956):

Of the divergent views which have been taken, the best-reasoned one would seem to be this: blood grouping test results which establish nonpaternity are conclusive on the issue of nonpaternity except where the evidence is such as to support a jury finding that because of a defect in the testing methods employed in a particular case (or because of a failure to show that the tests were properly conducted) the results of the tests could not be accepted as accurately reflecting the operation of immutable laws of genetics.
Id. at 1028.
Cf., e.g., B.S.H. v. J.J.H., 613 S.W.2d 453 (Mo. Ct.App.1981). The majority in B.S.H. v. J.J.H. upheld a trial court finding of legitimacy despite blood tests indicating nonpaternity. The test evidence was "of dubious accuracy and origin," without expert interpretation, and thus, did "not rise to the level of scientific proof at all." Id. at 457.
The dissent argued for the recognition of blood grouping tests as conclusive evidence in nonpaternity cases and would have reversed and remanded this case for development of competent blood test evidence. The dissent pointed to the judicial recognition of blood tests in criminal proceedings for child support, citing Missouri v. Summers, 489 S.W.2d 225, 228 (Mo. Ct.App.1972), "the reliability of blood tests properly given to prove non parentage in certain cases of blood groupings has become unquestioned in the scientific and medical world." The dissent in B.S.H. v. J.J.H. observed that:
The rationale which provides the presumption of legitimacy originated at a time when the scientific and medical world could not provide the degree of certainty of nonpaternity by blood group testing. The presumption was premised upon (1) the protection of the assumed virtue of the mother and the protection of innocent offspring from the undesirable effects inherent in branding a child illegitimate; (2) the preservation of the integrity of the family; and (3) the preference that support of a child is to be provided by the husband rather than the state.
B.S.H. at 460-61. The dissent acknowledged the laudable purposes of the presumption but questioned its immutable stance in the face of "an ever-increasing amount of literature and authority which recognizes the authenticity of blood tests as evidencing nonpaternity [citations omitted]." Id. at 461.
[9] McCormick's Handbook of the Law of Evidence (E. Cleary 2d ed. 1972) § 211, at 522, advises that, "It seems that the certain reliability of blood tests, carefully and expertly performed and adequately checked, to show nonpaternity is now so universally accepted by scientists that the courts should take judicial notice thereof and could wisely accord them conclusive effect." McCormick's Evidence notes that to hold that the presumption of legitimacy is so far conclusive as to disallow rebuttal by blood tests, "would often given an escape from responsibility to the true father, and the cases admitting the tests in rebuttal reflect the more expedient view." Id. at 521.
[10] Appellee only argues that another laboratory made a finding "contrary" to Dr. Stroud's. Dr. Robert Ferrell, University of Texas Health Science Center at Houston, conducted protein typing tests and concluded that the types he tested were "compatible" with paternity and that, "[T]here was no evidence for paternity exclusion."

Dr. Ferrell's conclusion is not contrary to Dr. Stroud's. Simply because appellant's red cell enzymes and serum proteins do not exclude him as the child's father, does not invalidate the finding that MN and HLA characteristics do exclude him. See, e.g., Reisner and Bolk, A Layman's Guide to the Use of Blood Group Analysis in Paternity Testing, 20 J.Fam.L. 657, 669-70 (1982); Shaw, Paternity Determination, 1921 to 1983 and Beyond, 250 J.A.M.A. 2536 (1983); Stroud, Bundrant, and Galindo, Paternity Testing: A Current Approach, 16 Trial 46, 48 (1980); Terasaki, Resolution by HLA Testing of 1,000 Paternity Cases Not Excluded by ABO Testing, 16 J.Fam.L. 543 (1978).